Jane F. FOSTER (Plaintiff), Appellant,

v.

Charles Harry FOSTER (Defendant), Respondent.

No. 29725.

St. Louis Court of Appeals.

Missouri.

April 2, 1957.

Motion for Rehearing or to Transfer to Supreme Court Denied May 3, 1957.

Kenneth Teasdale, Henry C. M. Lamkin, Cobbs, Armstrong, Teasdale & Roos, J. L. London, St. Louis, William M. Tannenbaum and Julius A. Polikoff, Chicago, Ill., of counsel, for appellant.

Coburn & Croft, Richmond C. Coburn, William B. Eldridge, St. Louis, for respondent.

ANDERSON, Judge.

This is an appeal by plaintiff, Jane F. Foster, from an order of the circuit court denying her motion to terminate temporary custody of the minor child of the parties, given to defendant, Charles Harry Foster, by an order entered July 8, 1955, and sustaining defendant's cross-motion for permanent custody of said child.

On July 13, 1952, plaintiff was granted a divorce and, by said decree, given the custody of their 5½ year old son Charles Harry Foster, Jr. The decree further provided that the defendant have temporary custody of said child, and have the right to visit said child as per stipulation filed. The stipulation provided that defendant "shall have the right to visit the child at all reasonable and proper times, and also have the right to temporary custody of the child at all reasonable and proper times."

On June 18, 1954, defendant filed a motion to modify and clarify the decree with respect to visitation and custody. Defendant was prompted to do this on account of frequent disputes and disagreements between the parties when he attempted to exercise his right of visitation and custody. Defendant testified that "every visit was tempered with the possibility that the door may not be open. * * * She told me her mother was getting active in this, her mother didn't want me to see the child at all. * * * Mrs. Foster told me that history was repeating itself—her mother didn't allow her to see her father and she wasn't going to allow me to see this child. She didn't see her father during her adolescence

from the time she was eight until she was twenty-three or four, and she was afraid this was happening to her."

However, in spite of her reluctance to permit defendant to have temporary custody, plaintiff did agree, in March, 1954 that defendant might take the child on a two weeks' vacation trip beginning June 15, 1954. Defendant made preparations for the trip by securing hotel reservations and arranging for transportation. Then, on June 15, defendant called for the boy at the residence of plaintiff's mother. No one answered the door. Later in the evening, in a telephone conversation, according to defendant's testimony, plaintiff told defendant she did not want him to take the boy "because she had dreamed and could foresee the future that we were going to have an airplane crash and we would die." It was after this episode that defendant filed his motion to modify the decree. This motion was continued, and while it was pending the father was given temporary custody for a 10-day period in September, 1954. On November 18, 1954, the matter came on for hearing, at which time the motion was sustained and the decree was modified by setting out in detail the times and periods of visitation and temporary custody, including a provision for custody in defendant from June 15th to July 1st in each year. The foregoing modification was by consent of the parties.

During 1954, until Thanksgiving Day, plaintiff resided at 2 Glen Creek Lane, in Ladue. In the fall of 1954 Charles, Jr. went to the Conway School in Ladue. He was in the second grade. He attended regularly until the 18th and 19th of October, when he was absent. He returned to school, but was absent again on October 25, 26, 27, 28 and 29. He returned to school after these absences, but beginning on November 9 he was absent every day until his mother brought him to school on December 3.

Plaintiff testified that the child was uncomfortable at the Conway School; that he complained to her that he was mistreated and was having trouble with the other children; and that he would come home in tears. She further stated that while she was ill it was necessary for the maid to dress the child and walk to school with him, because he was so disturbed she would not let him go alone. She further testified that although he bathed daily, he was accused of uncleanliness. On December 3rd plaintiff took the boy back to school, but after lunch he started to cry and said he did not want to go back because they poked at him, singled him out from the other children, examined him and made aspersions about him. The child was not returned to the Conway School after December 3rd.

Plaintiff testified that thereafter she tried to enroll the child in other schools. She went to and inquired at the Community School, but there was no room for him there. She then took the child to the Glen Ridge School and explained the situation to the principal. The latter, in the presence of the child, referred to him as a "problem child," whereupon the child burst into tears. He was not entered at the school. She took him to Principia, but could not enter him there because she was not a member of the Christian Science Church.

Mrs. Foster did not tell the defendant that the boy had dropped out of school. She stated: "The boy, I am sure informed him. I have had very few conversations with Mr. Foster. * * * I assumed he knew what the boy was doing because he was seeing him regularly, even when the boy wasn't able to go out." The defendant first learned that the boy was not in school about December 1, 1954. He called Mrs. Foster about the matter. In this conversation plaintiff said she was going to reinstate the boy in a day or two. The defendant kept in touch with the situation, and when she failed to reinstate the boy in school he called his attorney. After that a conference was had in Judge Weinstein's chambers where the subject of the child not going to school was discussed at great length. This conference was in January, 1955. The

attorneys for both parties, and Judge Weinstein, were present. The result of the conference was that Judge Weinstein informally ordered that the child be sent to the Taylor School.

Plaintiff then placed the child in the Taylor School. Dr. Taylor tested him, felt that he was bright and put him in the third grade, with the understanding that plaintiff would help him at home with his studies. The child attended the Taylor School for a week or ten days, then refused to continue further.

Defendant testified that he called Mr. Thies, plaintiff's attorney, and told him that if the boy was not going to school he ought to be tutored. Shortly thereafter he learned that Mr. Thies had procured a tutor for the child. The tutor employed was a Miss Meyer who was employed by the Clayton school system to help children in their work. She tutored the boy from March until the close of the school year. She spent from one to two hours with the boy, and came to the home at such times as best suited her. Plaintiff testified the tutor did a "wonderful job"; and that she herself helped him with his lessons.

On February 4, 1955, plaintiff filed a motion for permission to take the child from the state for the balance of the school year. In said motion it was alleged that plaintiff had not since the divorce had a vacation where she would be free from the prescribed commitments as to weekly availability with respect to the child; that she and her son had been under constant restraint, with the result that both she and her son had become apprehensive to the point that their lives moved in a state of constant unrest; these conditions "obtaining by reason of the steadfast expression of dissatisfaction on whatever moves, whatever actions, whatever schools the plaintiff elected upon or the son subscribed to." It was then alleged that it would be to the interest of the plaintiff and the child to be free for a reasonable time from the consistent pressure that had been exerted; that the schooling of the child had been interrupted for one reason or another in three different schools so that a change to an additional school would not provide an unusual or unreasonable circumstance; that the court had ordered an investigation which might alter or change the future custody of said child, and during the period of investigation it would be well to permit plaintiff and the child to have a chance to compose themselves and be free from continual and constant duress, admonition and warnings by defendant, so that after the court should examine into the matter the child would be in a sufficiently composed state of mind to enter into such program of education, custody and control as the court might order. The prayer of the motion was that plaintiff be given authority to take a vacation away from the city and state for the balance of the school year, conditioned upon the child being placed in a school of acceptable standards during the balance of the school year, and that defendant be ordered to not molest, interfere or place any restraint upon either plaintiff or the child, unless for good cause shown to the court.

No action appears to have been taken on the foregoing motion.

On February 8, 1955, defendant filed a motion to modify the decree and award him the custody of the child. The grounds of said motion, among others, were that the child was not in attendance at school, and that plaintiff, due to her condition of health, was not a proper custodian of said child.

On February 11, 1955, the court entered an order that the child "remain in the custody of the plaintiff and that he be entered in the Taylor School in Clayton, Missouri, on Monday, 2–14–55, subject to the right of visitation and temporary custody as heretofore ordered."

On February 26, 1955, pursuant to agreement of counsel, the court ordered defendant to refrain from any interference with plaintiff's right to custody of the child, and to confine his relations with said child solely

to the rights of temporary custody as previously ordered.

Defendant testified that he did not know of this order being entered until a much later date, and thought it was entered by the court to placate Mrs. Foster.

Under the decree, as amended, defendant was entitled to the custody of the child for two weeks beginning June 15, 1955. On that date defendant went to the home of plaintiff's mother and step-father to get the child. Plaintiff and the child had been living there several months. Defendant testified that although he made enough "racket" to be sure that everyone in the house knew he was there, no one answered the door. A citation for contempt was then issued against plaintiff, which the sheriff's office was unable to serve.

On June 16, 1955, defendant filed a motion to modify the decree to give him custody of the child. The next day, June 17, he filed a motion praying that the court order an investigation of the child's environment and home atmosphere; that the court appoint a physician to make a physical and mental examination of the mother; and that the court appoint a physician to examine the child. On June 17, 1955, defendant filed a motion for an additional citation for contempt. The latter motion was sustained, and a citation issued returnable July 1, 1955. On July 8, 1955, defendant filed an amended motion for an investigation and medical examination. This motion was on said date sustained in part, and the court ordered that:

"* * * Dr. Max Deutch is hereby appointed and directed to examine the minor child, Charles Harry Foster, Jr., without further delay, and that said physician shall report his findings to this court.

"That the Sheriff of the County of St. Louis is hereby ordered and directed to enter the residence at 51 Lake Forest, Richmond Heights, St. Louis County, Missouri, and obtain said minor child, where he is in the custody of the plaintiff, to deliver said child to said Dr. Max Deutch for said examination and after said examination is completed to return said child to 51 Lake Forest until July 13, at 2:00 p. m., at which time he shall deliver said child to the defendant who shall have temporary custody of said child during the illness of the plaintiff and until the further order of this court, which may be made without need for further service herein. Application for citation for contempt dismissed. Defendant to pay the expense of the examination of said child."

This order was placed in the hands of Phil K. Moeller, Deputy Sheriff, for execution. He went to the place designated in said order, accompanied by defendant and two of defendant's workmen. The Chief Deputy Sheriff had made arrangements for these two men to accompany Mr. Moeller. They had with them a saw, screw driver, crowbar, and sledge hammer.

Moeller testified that when he arrived at the house he was admitted by Mr. Freund, plaintiff's step-father. He informed Mr. Freund of the order. The latter told him that Mrs. Foster had barricaded herself in a room on the second floor and that he could not persuade her to open the door. Mr. Freund showed Moeller the door to the room where Mrs. Foster was. Mr. Moeller knocked on the door and identified himself, but plaintiff refused to open the door. He read the order to her, but she still refused to open the door. He told her that unless she opened the door he would have to force it. She still refused. Moeller's men then tried to remove the door from its hinges, but without success. Finally, a door between her room and the bathroom was pushed open. Mrs. Foster and the boy were in the room. A dresser, chairs and lamps were piled against the door. The sheriff, with the assistance of a colored man whom the boy knew, took the boy outside and delivered him to defendant. Defendant had remained outside the

house during this occurrence. The defendant and the deputy sheriff then took the boy to the defendant's home where he was bathed and dressed in clean clothes. In the meantime, defendant called the doctor who came immediately and made an examination of the boy. Moeller testified that the boy was pale, and not too clean.

Defendant testified that when the deputy sheriff came out with the boy, "the child ran to me; he was frightened; he was crying; I tried to reassure him. The deputy sheriff and I drove off to my apartment over on Delmar. * * * He was very thin; he had a very pale pallor. He was agitated, very dirty, extremely dirty underwear, clothing, his teeth had green on them; he looked just like a little wild Indian. I always had a change of clothing for him at the apartment, so I changed his clothes, washed him, combed his hair, tried to quiet him down and reassure him this was not as bad as all these appearances made it seem, and the deputy sheriff was most cooperative. He and I tried to joke with the child and put him at ease."

Defendant then testified that Dr. Rubenstein came and examined the boy, after which defendant, the deputy sheriff and the boy had dinner at Busch's Grove. The boy was then taken back to 51 Lake Forest.

Dr. Rubenstein is a psychiatrist. He did not make a physical examination of the boy, but talked with him to determine whether he needed emergency treatment. The boy was very quiet and seemed to be cowed and frightened. He didn't talk much, but was cooperative. The doctor did not find him to be overly anxious or panicky. Arrangements were made for him to go to the doctor's office for further treatment. During the course of that treatment Dr. Rubenstein saw the boy three times a week until February 28, 1956. When the doctor began these treatments he found the boy extremely restless. It was impossible to carry on any kind of conversation with him. The doctor stated: "After a few words he would be rushing around the office in a rather destructive way, unable to really concentrate on why he might be there or what he might be talking about. He wanted to play games, but they were done in a rather aimless way, I thought, at first, with a great deal of restlessness and aggressiveness behind it, so the initial contact with him to me made him appear as a disturbed, very restless, driven boy who appeared to have a considerable amount of anxiety underneath and really could not make effective contact with me. * * * It indicated to me that this boy was suffering from a, well, you might call a chronic behavior disorder brought on by too much anxiety."

The witness further testified that the last time he saw the boy in February, 1956, "I felt he had made substantial strides forward; that he was a much less restless boy; that his play was much better organized; that he was capable of telling me more of what was going on around him; capable of relating more to me; capable of carrying on conversations for not only longer periods, but in a normal way, in a less disturbed and anxious way, and from what I could tell, so far as his outside experiences were concerned, was doing quite well, or better, at least, like his work at school, his relationship with his boy friends and in his relationship with his father I thought he was doing quite well too. * * * It indicated to me that he was making strides, that I felt that the move that had taken place and the situation he was in, living with his father, had a healthy medium to it for him, and I felt he could make still further strides if treatment had continued. It showed he was flexible, was not in any way unduly damaged and could be helped."

The doctor said that he saw the boy on August 7 and 9, 1956, and found him to have continued his improvement. The doctor stated that: "We had to spend an hour talking with each other. It was a very good give-and-take on his part. He carried on a very meaningful conversation; he talked to me about how he was handling his environment, difficulties it was causing him, how he overcame the difficulties, and I

was quite heartened by his progress. * * " The doctor further stated that the boy looked very well physically, and had made gains in his emotional life, even since the preceding February.

The plaintiff testified that she knew that defendant had the right to temporary custody under the court decree for two weeks beginning June 15, 1955. She said she thought the boy was in no condition to travel at that time. She said she asked her attorney, Mr. Thies, to petition the court to keep the boy in the state, but for some reason this seemed inauspicious to the lawyers. She refused to give defendant the boy when he came to get him. She told Mr. Thies that she could not under any circumstances give the boy to defendant, and felt she could not let the boy go traveling.

Defendant lives in an apartment at 8307 Delmar Boulevard, University City. The apartment contains a combination living room-dining room, kitchen, bathroom, and three bedrooms. The boy has a separate bedroom. Defendant employed a practical nurse who would be at his home when the boy would arrive from school at about 12:30 p. m. The nurse remained throughout the afternoon. Defendant also had in his employ a colored woman who had worked for him about four years. She cleaned the premises six days a week. Defendant also hired a young girl to be with the boy in the afternoons.

In September, 1955, the boy was enrolled at McKnight School in University City. He entered the fourth grade at the time. There were several boys his own age living in defendant's neighborhood who were attending the McKnight School. He remained in the McKnight School during the entire school year. His teacher informed defendant that the boy was cooperative, friendly, and did well. He attended regularly, being absent one Jewish holiday and one day when he was ill. Defendant testified that he assisted the boy with his homework almost every evening, and although he had a rather difficult time, especially in

reading and writing, for the first six or seven months, he had substantially improved and was prepared to go into the fifth grade at the end of the school year. He made none of the complaints with reference to his treatment at school similar to those he made while attending the Conway School.

As a part of the arrangement for temporary custody the boy has been spending the time between 5:00 p. m. and 8:00 p. m. with his mother. He comes home from school at 4:00 p. m., changes clothes, and leaves in a taxi at about twenty minutes to five to be with his mother. To avoid being embarrassed before her neighbors, plaintiff has arranged that the child be brought to her mother's house at 51 Lake Forest. After he arrives there he is taken out to dinner at some restaurant or club. Plaintiff's mother and father usually go with them. After dinner plaintiff and the boy either play with his toys, watch television, or just talk. He leaves for his father's apartment at 8:00 p. m. from 51 Lake Forest.

Dr. Rubenstein, when asked for his opinion as to the possible effect on the child of the arrangement whereby the child is shifted daily from one parent to the other, replied:

"I felt that this arrangement was not good for the boy for the reasons I will outline now. It is important, I think, in the development of any child, to have a consistent parental, stable environment, and to be shifted back and forth each day between one parent and then another, and have to learn how to deal with one parent and then the other, especially when there are conflicts seemingly between the parents, I think destroys the stability a boy needs for identification, and a boy definitely does need identification with a father if he is going to make an adequate masculine identification. * * * To be shuttled back and forth I find with Chick Foster at the

time I saw him was very, very disturbing to him. He had to take on different patterns of behavior, with one person then with another person, and I think it weakened him rather than strengthened him. It tended to lead him to the point of view of behaving more in terms of what he thought people wanted from him rather than what the circumstance of the situation called for * * * and I thought he was getting enough benefit from his relationship with his father that this should not be diluted with his having to see his mother three hours and perhaps being disturbed by that period of time. I think he should have had the benefit of a continuous stable relationship with his father. This is why I felt he should not be seeing his mother that often, or at least every day, in that way. I thought the arrangement was particulary traumatic, not only to him, but I think to any boy under those situations."

After defendant was given the custody of the child under the order of July 8, 1955, he entered him as a student in the Whitfield School, a private tutoring school. The boy attended this school from July 20, 1955, to September 1, 1955. He attended this school, from 9:00 o'clock in the morning until 12:00 o'clock noon, for five days a week. Defendant stated his reason for sending the boy to this school was to enable him to catch up in his school work with the boys of his own age. The boys of his age were in the third grade. Defendant further testified that he had no trouble with the boy in connection with his attendance at the Whitfield School. The boy wanted to go and was enthusiastic about it. He had none of the trouble he experienced at the Conway School.

The fourth-grade teacher at the McKnight School, Virginia Gossom, testified by deposition. The boy was in her room during the 1955–56 school year. Her records at the end of the year appraised the boy in this manner:

"Chick has grown during the school year in his scholastic ability, social development and emotional security. He has been a behavior problem at times but has learned to conform to the rules. * * * His work habits need to improve. * * * I feel confident Chick will continue his fine growth under constant love, guidance and understanding. * * * He will return to the fifth grade in the fall."

Miss Gossom thought that, generally speaking, the child had progressed a year's growth in his work and that his work had progressed a great deal since he first entered the school. He was working up to his capacity and up to the fourth grade level. She had various conferences with the father about the boy's school work. She saw defendant about once a month. The defendant seemed to be very interested in the boy's progress. He was more than willing to do anything to help in this progress. He attended several P.T.A. meetings.

In September, 1955, the boy joined the Cub Scouts and has made friends with several boys in the neighborhood. During the summer of 1956 he attended the Deerfield Camp, a day camp for boys, operated by members of the staff of the Country Day School. He would leave home for the camp at about 8:30 a. m. and arrive home at 4:30 p. m. He won six awards at the camp for marksmanship with the bow and arrow, and rifle. He is in a swimming group. Defendant has had no trouble with him about attending this camp. The boy enjoys it. In school he advanced from the bottom of his class to about the middle group and, according to the testimony of defendant, seems to know his problems and is developing a personality of his own. On Friday nights defendant employs a sixty-five year old woman as a baby-sitter with whom the child goes to the movies. Defendant is not usually home on Friday nights. Defendant has in his employ a servant who will prepare dinner for the boy.

Defendant was 41 years old at the time of the hearing in 1956. He is engaged in the

real estate and construction business with an office in Clayton, Missouri. He attended Wright Junior College, Northwestern University, and the University of Chicago. He did not graduate from any of these schools. He left school in 1936. Between 1936 and 1942 he worked for about eight different employers for periods ranging from three months to not more than a year.

From November, 1942, until September 24, 1945, defendant was in the United States Navy, and for a little over a year after October, 1943, he was flight instructor, full time, at Lambert Field. In September, 1945, he resigned from the Navy. Just prior thereto he had permitted an enlisted man to sign onto his flight schedule in order to receive flight pay when the enlisted man had actually not flown. This was against regulations and defendant was threatened with a court martial. Finally, his superior officer agreed to let him resign if he would agree not to take a certificate of satisfactory service. This he did, and no charges were brought against him. Later, the defendant appeared before an official Review Board, and after a hearing a certificate of satisfactory service was awarded to him.

It was brought out during the cross-examination of defendant that although he knew that regulations forbade his carrying on an active business while in the Navy, he did, while stationed at Lambert Field, assist his father in his business at St. Louis. It appears that his father was ill with cancer at the time and that he helped his father for about forty-five days, in the evenings and sometimes when he had a day off. He told his superior officer that he was doing this and was advised by the latter that he could do this as long as it did not interfere with his duties. Defendant stated that he did this work while off duty, and that it did not interfere with his duties as flight instructor at Lambert Field. In a deposition taken before trial he testified that he had an interest in the business. At the trial, he testified he did not have such interest, and that when asked about his testimony given at the deposition stated that at the time he did not understand financial interest was meant.

It was also brought out on cross-examination that defendant endorsed and cashed a check, dated August 4, 1953, payable to plaintiff. In explanation of this, defendant testified that the check was in liquidation of a credit balance on a charge account at Kline's which the parties had while they were married. The account was in Mrs. Foster's name, but he paid the bills. Kline's had been calling defendant to close the account, and defendant had requested plaintiff to use the credit, which she refused to do. Defendant finally requested Kline's to send him the check.

Plaintiff contends that defendant is possessed of a cruel nature and hence not a fit person to have custody of the boy. In support of this contention plaintiff makes reference to an incident which occurred in December, 1954. It is stated that defendant took the boy on a vacation trip to Florida at that time, telling plaintiff that he and the boy would stay at the Sans Souci Hotel; that they did not stay there, and did not inform plaintiff of the whereabouts of the child.

The defendant did take the boy to Florida in 1954. He testified that he originally had reservations at the Sans Souci but changed these plans and stayed at the Balmoral Hotel because the Sans Souci's rates were exorbitant. When asked if he informed Mrs. Foster of his change in plans, he said he instructed his attorney to advise plaintiff's attorney of them since he had been instructed not to contact her.

For the last seven or eight years defendant had on occasion consulted Dr. Conrad Summer, a psychiatrist. When asked if he was still under treatment, defendant replied: "I see him more in my problems concerning my son than about my own problems." Defendant said he also saw the doctor about his own problems. He stated: "I have a problem with Chick, with Harry. He comes back from his mother disturbed and upset, rejected, afraid, abused, and I

have been trying to restore him through my help. * * * I see him (Dr. Summer) about my own problems. * * * How to adjust to a real bad situation."

It is urged in appellant's brief that it was on account of defendant's interference that the boy refused to continue at the Taylor School. It appears from the evidence that defendant did object to the Taylor School and, on January 21, 1955, wrote a letter to Mrs. Foster in which he stated that he would like to discuss the matter with her in the presence of her attorney. It also appears that prior to the child's entering the Taylor School he did tell the boy that he ought to suggest to his mother that he be sent to a public school or a co-educational school.

Defendant visited the school and talked to Mr. Taylor, the head of the school. Defendant testified that after this conference he was satisfied that keeping the boy in the Taylor School was the best they could do under the circumstances, but that he still voiced an objection to the school to Mrs. Foster. He denied that he made known his objections to the child. Defendant stated:

"* * * I thought Chick belonged in a co-educational school. I still feel that is where he belongs and I would like him to be in one all the time. * * * I thought it (Taylor School) was a very good school. * * * But Mr. Taylor made it clear to me this was a school for children having problems of various kinds—not necessarily problem children. They wanted to get through school faster or wanted to specialize, that they had no real facilities for this young man because he was younger than they ordinarily took, and I still felt as far as Chick's best interests were concerned that he should be in a school with children his age. * * * I was satisfied that this was the best we could do under the circumstances, but I still voiced an objection to his mother. I thought if she had this child's interest at heart she would put him where he

would thrive, and this did not appear to be the place.

* * * * * *

"The following Monday morning, as I understand it from the testimony of Mrs. Foster, * * * he returned to school that Monday morning, started to cry and Mrs. Foster decided to remove him. * * * So far as I know that is true.

* * * * * *

"The boy told me he didn't go back to school because his mother didn't want him to go back."

After the divorce in June, 1952, and until about Thanksgiving, plaintiff and the child lived together in her home in Ladue. On Thanksgiving Day, 1954, she and the child moved to the home of her parents at 51 Lake Forest, Richmond Heights, Missouri. Plaintiff's mother is 60 years old and her step-father is 78. In November, 1954, plaintiff was ill with virus pneumonia. Plaintiff did not move back to her own home until two or three months prior to the trial. The house in Ladue has nine rooms, all on one floor. It is fully furnished, contains the latest appliances, and is air-conditioned. It has nice grounds around it. A maid is employed. Plaintiff and the child usually go out for dinner. Plaintiff sleeps and entertains there. There are boys nine and ten years old in the neighborhood. Plaintiff testified that she felt mentally and physically capable of taking care of the boy; that she had always tried to give him a mother's care and tried to look after him to the best of her ability; and that she intended to see that he got the proper education and the proper moral and religious training.

From March 7, 1948, to March 7, 1953, plaintiff was under the care of a psychiatrist. Since the latter date she had not consulted a psychiatrist except for a short time when she went to two or three psychiatrists to help her readjust herself for the "loss of someone who had helped me a great deal." The details of this were not gone into.

Dr. Jack R. Eidelman, a psychiatrist, testified that Mrs. Foster consulted him six or eight times in the spring and summer of 1954. He stated that he classified her reaction as an anxiety state or disturbance. She complained primarily of tension, restlessness, inability to sleep, and worry about the proceedings concerning her child. He stated that he never considered her abnormal in the sense of being mentally deranged, but highly emotional. The doctor further testified that plaintiff was assisting him in writing a book, and that he had conferences with her twice a week for the last several months, also social contacts. He stated that in his opinion she was in a proper physical and mental state of health to be a fit and proper person to have custody of her child.

Dr. Llewellyn Sale, an internist, saw Mrs. Foster professionally on three occasions in June, 1955. Thereafter, he made the following report to the court:

"I saw Mrs. Jane Foster, 51 Lake Forest, on June 13th, 15th and 18th, 1955. On these occasions I examined her and found no evidence of any morbid condition, nor any residual of any illness that she may have had.

"Her physical condition is such that she may engage in her usual activities and discharge such obligations as she may have."

Dr. Sale further testified that he had seen Mrs. Foster a few times since the June, 1955, visits, but not professionally, and that from those contacts with her it was his opinion that she was in such physical condition as to be able to take care of an eight or nine year old boy.

Dr. Margaret Cecelia Reichert testified that she gave Mrs. Foster a physical examination on April 10, 1956. The examination consisted of X-rays and laboratory studies consisting of a basal metabolism test, blood count, urinalysis, upper gastrointestinal X-rays, gall bladder X-rays, and chest plate. All findings were within normal limits. There were no findings that indicated any present or potential disability of any sort.

Plaintiff testified on cross-examination in response to a question whether she had ever cursed the boy that she might have, that she was not inhuman; that she told him he should respect his mother; that when he was wrong she corrected him.

Defendant testified that in August, 1954, the boy ran away from his mother and rode his bicycle to defendant's apartment. Defendant put the bicycle in his car and drove the boy back to his mother's house. The same thing happened about six months later.

Miss Cordelia Ahrens, Principal of the Conway School, testified that on one occasion the school nurse called her attention to the fact that the boy was dirty and unkept. She testified that it was an unusual case; that there was an unclean odor in the room and an uncleanliness that went a little deeper than what a boy gets during the day. Miss Ahrens talked with him and suggested he take a bath that evening.

Plaintiff's motion for an order terminating defendant's temporary custody alleged that plaintiff was in sound health.

Defendant's amended motion alleged that:

"* * * from and after the date of the modification of the aforesaid decree on the said 18th day of November, 1954, circumstances have arisen which make it to the best interest of said minor child that the custody of the child be awarded to his father, the defendant, in this: that the mental health of the plaintiff, as evidenced by her removing the minor child from school and neglecting to reinstate him in school, from the manner in which she has cared for the child while in her custody, and from her wilful and flagrant disregard of the orders of this court, prevents the plaintiff from being able to give the said child adequate care and provide

said child with an undisturbed home life, and requires that the care and custody of the child be entrusted to his father, the defendant, where the child will be kept in school and will be afforded a normal and undisturbed home life."

At the close of the case the court permitted defendant to amend said amended motion by inserting the following allegation:

"Further the defendant says that the treatment of the said child while in the custody or company of plaintiff since said date demonstrates that it is in the best interest of the child that defendant have custody of said child."

Appellant contends that the trial court erred in denying her motion to terminate the temporary custody given to the defendant by the order of July 8, 1955, and erred in sustaining defendant's amended motion for permanent custody.

With reference to the first proposition, it is urged that since the uncontradicted evidence shows that plaintiff is not ill, the basis for temporary custody no longer exists. As to the second proposition, it is urged that defendant failed to prove a change of condition which would warrant a change in custody. It is also urged that the court's implied finding that defendant was a fit and proper person to have custody of the child is against the overwhelming weight of the evidence.

Appellant takes the position that only those matters occurring subsequent to the orders of February 11, 1955, and July 8, 1955, are proper for consideration on the issue of changed conditions, which must necessarily be shown in order to warrant a modification of the custody provisions of the original decree. In other words, the doctrine of res judicata is invoked.

 There can be no question but that the doctrine applies in child custody cases when there is a final determination and order made. The provisions of a divorce decree respecting the custody of a minor child can only be modified upon a showing of changed conditions since the entry of the decree or a subsequent judgment dealing with the matter of custody. Samland v. Samland, Mo.App., 277 S.W.2d 880; Hachtel v. Hachtel, Mo.App., 291 S.W.2d 201; Rone v. Rone, Mo.App., 20 S.W.2d 545; Hupp v. Hupp, 238 Mo.App. 964, 194 S.W.2d 215; Hawkins v. Thompson, Mo. App., 210 S.W.2d 747; Crooks v. Crooks, Mo.App., 197 S.W.2d 678.

 For a judgment or order to be res judicata it should be responsive to some pleading in the case and entered after a hearing on the issues raised by such pleading. In the case at bar the order of February 11, 1955, was not made in response to any pleading in the case. Nor was there any hearing at which evidence was heard pro and con on the issue of plaintiff's then fitness to have permanent custody of the child in question. The order did not purport to rule the motion to modify then pending. Had it done so, it would have been an exercise of power in excess of jurisdiction State ex rel. Tatum v. Ramey, 134 Mo.App. 722, 115 S.W. 458. The order therefore did not have the effect of foreclosing inquiry into changed conditions brought about by circumstances antedating the order. Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458.

The order of July 8, 1955, was entered upon an amended motion filed that day by defendant, which, after reciting the filing by defendant of the motion to modify the decree with respect to the child's custody, prayed that the court order: (1) an investigation of the child's environment and home atmosphere; (2) that the court appoint a physician to make a physical and mental examination of the plaintiff; (3) that the court appoint a physician to examine the child; (4) that the court enter such temporary order with reference to the custody of the child as will be in the best interests of the child; and (5) that the court order

the sheriff to obtain the child from plaintiff so that said examination of the child could be made.

■ The relief granted by the order sustaining this motion was, with reference to custody, that "defendant have *temporary* custody of said child during the illness of the plaintiff and until the further order of this court." (Emphasis ours.) It did not purport to deal with permanent custody, or with the issues raised in defendant's motion to modify the decree with reference to permanent custody. Being temporary, the order does not have the force and effect of res judicata. Laplace v. Briere, 152 La. 235, 92 So. 881.

Appellant contends there was a total failure of proof that there was a change of condition due to mental illness which required a change in the custodial arrangements. It is true that defendant failed to prove that plaintiff was at any time mentally deranged; but it does appear that plaintiff is a highly emotional person, and in our judgment this has had a very bad effect upon the child and is one of the elements to be considered in determining the issue before us.

Appellant next contends that there was a failure of proof of the allegation that "the treatment of the said child since said date (November 18, 1954) demonstrates that it is to the best interest of the child that defendant have custody of said child." In other words, appellant, in effect, says that the facts shown do not warrant a finding of changed conditions upon which to base a change in custody. To this we are unable to agree.

From the evidence, we are convinced that plaintiff, due to her temperament and to the fact that the child has grown older, is incapable of properly caring for him in the matter of his education, personal habits, and social adjustments. This failure is due mainly, not to any mental illness, but, in our opinion, to an emotional instability on her part and an inability to meet the problems with that firmness which the situation requires. From the evidence, it is apparent that the child is in need of the sterner and stronger discipline of his father. The welfare of the child demands it.

■ In reaching the above decision we are not punishing plaintiff for her shortcomings with respect to her inability to keep the child in school, or for her defiance of the orders of the trial court. The latter, however, may be considered, as was done in the case of Shepard v. Shepard, Mo.App., 194 S.W.2d 319, loc. cit. 327, where the court said:

"It is also apparent from the record that plaintiff has little respect for the orders of the courts. If they do not please or satisfy her she feels perfectly free to ignore the whole proceedings, to go her way and do all she can to prevent such orders being executed or obeyed. A person with such little regard for constituted authority can hardly lay claim to being an ideal person to direct the training and upbringing of a young child. Certainly her attitude towards the court, which she asked for relief, is a fact to be considered in determining the welfare of the child. It is not for the purpose of punishing her—but rather for the purpose of measuring her mental attitude toward law and order."

■ A consideration of all the testimony in this case compels us to say that the evidence fully established a change of condition which calls for a change of custody.

But appellant contends that defendant is not a fit person to have custody of the child. Great stress is laid on the incidents which occurred while defendant was in the Navy. These occurred many years ago, and while the conduct complained of is not to be approved, it does not establish defendant's unfitness when considered with the other facts and circumstances established by the evidence. It appears that the father has been successful with the child since he received

custody in July, 1955. The father has kept the boy in school and has aided in his school work. He has kept in touch with the boy's teachers, and attended P.T.A. meetings. He has had no trouble controlling the boy. The boy's emotional life, according to the testimony of Dr. Rubenstein, has improved steadily since defendant obtained custody. He is happy with his father. In our judgment defendant is a proper person to have custody of the child. The evidence is overwhelming that it is for the best interest of the boy that his father be his principal custodian.

The judgment of the trial court is affirmed.

RUDDY, P. J., and MATTHES, J., concur.