Asbury Bryant HIRSCH, Respondent,

v.

Monique HIRSCH, Appellant.

No. 23657.

Kansas City Court of Appeals.

Missouri.

April 1, 1963.

Rasse & Rasse, Marshall, for appellant.

Roy D. Williams, Dale Reesman, Boonville, Raymond C. Lewis, Jr., Smith & Lewis, Columbia, for respondent.

HUNTER, Judge. .

This appeal is by a mother who was deprived of the custody of her children as a result of a hearing on child custody motions.

Appellant, Monique Hirsch Siefkas, and respondent, Asbury Hirsch, were formerly husband and wife and resided in Boonville, Cooper County, Missouri. On March 9, 1961, Mr. Hirsch obtained a decree of divorce from Monique Hirsch (Siefkas) in the Circuit Court of Cooper County which decree awarded Monique Hirsch the custody of the two minor children born of the marriage; Simone, then age 9 and Christine, then age 5, and $350 per month child support. Mr. Hirsch was granted reasonable visitation privileges. The divorce decree also provided the children could not be removed from the jurisdiction of the circuit court without the permission of the court.

Approximately 3½ months after the divorce Mrs. Hirsch with the two children moved from Boonville, Missouri, to Columbia, Missouri. On July 20, 1961, she married James Siefkas, a graduate of the University of Missouri who possessed a Master's Degree in Education and who had for two years been teaching at Christian College in Columbia, Mo., while obtaining his Master's Degree.

Mr. Siefkas secured employment as a teacher of English and speech at Northwest State Teachers College in Maryville, Missouri, and in August of 1961 Mrs. Siefkas, her husband and the two children moved to Maryville where they lived until late September, 1961. At that time Mr. Siefkas, a member of the military reserve, received orders activating him and ordering him to report to Ft. Devens, Massachusetts, not later than October 16, 1961, for a tour of duty not exceeding twelve months.

Mrs. Siefkas wished to accompany her husband, and in accordance with the divorce decree filed a motion with the Circuit Court of Cooper County requesting permission to remove her children from the court's jurisdiction so she could take them and accompany her husband in his temporary military assignment.

Mr. Hirsch filed a motion opposing his former wife's motion. His motion contained no allegation of any change of conditions since the divorce but said, " * * * if conditions surrounding said minors have materially changed as a matter of law, then the provisions for the custody and control of said children, and the allowance made by the court, for the support of said children should be reviewed by said court, and, further answering, the said A. B. Hirsch requests the court to award him the custody of said children; that his mother, his two aunts, and his sister, will assist in rearing said children; that they will have a permanent home, permanent school and permanent church affiliations, if the custody is awarded to the said A. B. Hirsch."

The two motions were heard in part on October 16, 1961, and continued to and completed on November 13, 1961. We proceed to summarize what we deem to be the pertinent evidence adduced at these two hearings.

Mrs. Siefkas testified that under Army regulations a wife and her children were allowed to accompany the husband to Fort Devens. His travel orders provided, "Travel of dependents and shipment of household goods at government expense is authorized * * *." To her knowledge there were good schools and adequate church facilities in the area where they would live, and as soon as her husband was released they would return to Missouri. She stated her opinion that the temporary move would not be detrimental to the children's welfare.

On cross-examination she testified one of her children had gone to school in Boonville (the other was then too young for school) until she moved during the summer vacation time to Columbia; that both children are now attending public school in Maryville; that her two children have not

had their religious affiliations changed and often still go to the same church; and that since she doesn't usually have them on week ends their father takes them to church. When asked how Mr. Siefkas disciplined the children she replied, "He just uses a very stern tone of voice. \* \* \* (He is) firm when they need it. But he is not a stern person with them. He laughs with them, he takes them fishing, plays with them, sees to it that they study. He is a good father to them." She described their home in Maryville.

She was examined by the court as follows:

"Q You stated a while ago on the stand that your preference would be to go with your husband and take your children with you.

"A That is right.

"Q What would be your next preference? To stay in Maryville with your children or to go to Massachusetts without your children?

"A That is a hard question.

"Q I know it is.

"A I feel like, really I should be with my husband and my children should be with me.

"Q Suppose you can't have both. Which would you prefer?

"A I just can't make a decision."

At the November 13, 1961, hearing Mrs. Siefkas explained that. on the occasion of her two weeks' honeymoon when Mr. Hirsch had the children he sent one to Sedalia with an aunt and the other one remained in Boonville with Grandma. Upon her return when she got the children they seemed very upset. She stated Mr. Hirsch didn't give the children very much religious training prior to their separation but then he started to more or less use religion as a hold over them.

She stated unequivocally that she would return to Missouri with her husband when his tour of duty was over; that if permitted to take her children temporarily to Massachusetts she was agreeable to modifying the visitation privileges of Mr. Hirsch to allow him summer and Christmas visits and a three week vacation visit.

Mrs. Marilyn Snell of Columbia, Missouri, testified concerning the home and treatment of the children the three months they resided in Columbia. She was in their home at least five or more times a week. "Every time I went there, the children were always clean, the house was immaculate. They were very happy. Many times I have gone in the living room and he (Mr. Siefkas) would be sitting in the rocking chair with Christine and Simone in his lap, talking to them, and they were always doing things, swimming, fishing, go to the show. They were very happy, all four of them. They were always bathed and put to bed at night. They were always in bed by nine o'clock each night. And very rarely were they given sweets or soft drinks. Very rarely. They were well mannered. They were disciplined real well. Q What would state your opinion of that home to be? A I think it was a very happy, well kept, well organized home."

Captain Howard J. Blumgardt of the United States Army testified Mr. Siefkas' army pay with quarter's allowance would approximate $227.00 a month, that housing is critical, expensive and of poor quality in the Ft. Devens area and that the public schools are crowded. He thought it recommended that reservists not bring their families.

Mr. Hirsch testified he is the owner of a drug store in Boonville, and resides alone in a $25,000 home there. He is not remarried and stated he intends never to remarry. He does some of his own cooking. He eats some meals out and some at his mother's. His mother lives near him in Boonville and his sister lives in Kansas City. His mother does not intend to live

with him. His aunt, possibly over seventy years old, lives in Sedalia. He testified that since the children have been in Maryville (about two months) "they seem like they have changed a little in that they are afraid to say anything, in relation to what they have done, or what their school work is, if they have been to church or anything like that. They hesitate to say anything about it." The children stayed with him two weeks during the past summer while their mother was on her honeymoon. If he were given the custody of the children, "I would hire a housekeeper and an elderly lady and have her come in and do the cooking and the house cleaning. I would do the rest, with the assistance of my sister (who lives in Kansas City) and my mother, if anything unnecessarily came up." "Q Don't you think that this constant turnover of housekeeper, mother, sister, and so forth, might be slightly upsetting to the children in an over extended period of raising time? A Well, there is no—it would be impossible to tell whether there would be a turnover or not." He has no specific work hours. "Well, we close every night at six o'clock. I usually don't work every night until six. Possibly 3:30 or two every other day."

In speaking of Mr. Siefkas' father and mother he said, "Well, I think they are nice people and I think they would treat them (the children) right, * * *." When asked why the children's mother should not have their custody he replied, "She was unstable. She doesn't stay with anything very long. She wants to do one thing one day and one thing the next. She has moved around a lot."

Mrs. Blanch Hirsch, the paternal grandmother, testified the two little girls stay at her house "quite a bit". They cried one time when they had to leave. She would be glad to help in rearing the two children.

Mr. Hirsch's sister, Alice Pauls, testified she also would help and would more often come from Kansas City to Boonville for that purpose. She has seen the children very seldom since the divorce.

At the second hearing, James Siefkas, twenty-six years old, who had returned from Fort Devens testified he reported to Fort Devens on October 12, 1961. His MOS is military policeman, his rank corporal, and his pay is approximately $277.00. He has $1500.00 in savings, not including $3,000 of his money his father is presently using. He has located an apartment in Leominster, Massachusetts, about ten miles, a twenty minute drive, from the Fort. It has a kitchen, living room, two bedrooms and is fully adequate. There is a public school about one block away. He talked with the school principal to check the school situation. There are fourteen people in the fifth grade and twenty-eight in the first grade. The Army would provide all medical expenses for his wife and children. He has never used any of the children's support money for his or his wife's purposes. At the time of his temporary military call he was teaching speech and English at Northwest State Teachers College at Maryville where he will return and resume his teaching job when his military tour ends.[1] His teaching job will be given back to him both because of the promise of the college president and because of the law on the subject. He described the children, "I feel as if they are my daughters now. They are very charming children and I love them very much." He thinks it is up to his wife and children as to where the children should go to church. He has spanked the children a couple of times but has never punished them severely.

Upon examination by the court Mr. Siefkas stated that after his present wife had been separated from her husband for

---

1. Appellant's counsel informed the court at the time of oral argument that Mr. Siefkas' tour of duty has now ended and that he is back at Maryville. However, since respondent's counsel objects that this statement is outside the record, we have disregarded it.

many months but before the divorce decree was rendered on March 9, 1961, he did have some dates with her; that their conduct was at all times proper, and it was not until after the divorce that he became serious and made any plans to marry her.

As to his future Siefkas testified he is an educator and his teaching position at Maryville is a good one. He hopes to remain there a long time. His wife wants to take some college work there also and try to get a degree.

Mr. Siefkas testified the children are happy in the public school they attend in Maryville. It was both his and his wife's idea to send the children to that school. Mrs. Monique Siefkas testified she went to see the children's teachers in Maryville concerning their change from the Boonville school. The teachers told her "the children were doing real well, that they were happy, normal, well-balanced children." A letter dated October 27, 1961, from Delores M. Bowles, supervising teacher, Northwest Missouri State College, was received in evidence without objection. It gave the following school information concerning Christine, a first grade student at Horace Mann Laboratory School, Maryville:

"Behavior:

| | |
|---|---|
| toward classmates | Good |
| toward teacher | Very Good |
| toward student teachers | Very Good |

"Teacher's Observation:

| | |
|---|---|
| of intellectual development | Showing desired improvement |
| general deportment | Very good |
| emotional control | Very good |
| nervous reactions of child | Average |
| appearance | Very good |
| personality | Very good |
| dress | Very good |

"Mrs. Delores M. Bowles, Supervising Teacher

A. B.S. in Educ., SMS, Springfield, Missouri
   M.A. in Educ., Long Beach State, Long Beach, California

B. UCLA, Orange Coast College, Costa Mesa, California

C. 26 years teaching experience

D. Grades taught: Kindergarten through Eighth"

———◆———

Also received in evidence without objection is a letter dated October 27, 1961, from Dean E. Savage, Horace Mann High School, concerning school information relative to his fifth grade pupil, Simone Hirsch. It read: "Simon(e) is a well-behaved and very likeable girl. She gets along well with her peers both in the classroom and on the playground.

"Simon has made satisfactory progress in subject matter areas this year. She is an average student in most areas but tends to excell in reading.

"Simon appears to be well adjusted and has not shown any uncommon signs of nervousness.

"She is also a very attractive and is always very clean and well dressed.

"I hold a Bachelor of Science Degree in Elementary Education from Northwest Missouri State College, Maryville, Missouri, and a Master of Arts Degree in Elementary School Administration granted by Northeast Missouri State Teachers College, Kirksville, Missouri.

"I have been a school administrator and teacher for three years, teaching a combination of grades five through eight."

Claude Siefkas, James' father, testified he and his wife lived about four miles east of the Marshall Junction on a farm. The children have been in his home many times. They are well behaved, normal, and very sweet children. He knows his son's financial condition and it is good. He owes his son $2,700 and will repay it any time it is desired and would help his son financially any time such help is needed. Mr. Hirsch visited him once after his son's marriage to Monique and told him "he was glad that Monique had married into the family like ours was, and that he appreciated how we had accepted his daughters, and even talked about the possibility of them staying with us."

James' mother, a school teacher, testified the children are well-dressed, clean and very neat. They have good manners and are well-behaved children. They are very happy. Her son, Monique and the children do things as a family together.

The court with the consent of the parties visited informally with the two children alone in chambers. He stated they said they loved their father and that they indicated a preference for their Boonville home and their school there and did not want to go to Massachusetts to live.

We have purposely omitted reference to the evidence pertinent to the question of whether the $350.00 monthly support allowance should be reduced. The court did not pass on this question but rather conditionally on a suitable housekeeper being employed by Mr. Hirsch ordered the custody of the two children be taken from their mother and given to their father, with reasonable visitation privileges to the mother together with certain specified holiday visitation.

With this evidence before us we state several well established pertinent rules that affect our ultimate decision. First is the fundamental that in awarding the custody of a child of divorced parents the paramount concern of the courts is the welfare of the child—i. e., what is to the best interest of the child. At the time of the original divorce decree on March 9, 1961, just eight months prior to the completion of this hearing on November 13, 1961, the trial court found the best interests of the children would be served by awarding their custody to their mother. As stated in S. v. G., Mo.App., 298 S.W.2d 67, 77, the rule is that "In making our determination we commence with the presumption that the child was with the right party at the outset because that is where the court had placed it." Since by the original decree the custody of the children was awarded to the mother she is entitled prima facie to continue to have that custody.

A provision once made becomes as conclusive as any other order or decree, and can only be modified on a showing of sufficient subsequently changed conditions. Here, the father has the burden of proof of showing by a preponderance of the credible evidence that in the eight months since the date of the divorce decree granting custody of these children to their mother there has occurred, changed facts and circumstances which, in the best interests of the children, require modification of the original decree. In our review, we must bear in mind that it is not sufficient simply to show some change in circumstances but that modification is justified and permitted only upon proof of changed conditions affecting the welfare of the children to a substantial or material extent, and that it is no longer in the best interests of the children to have the original custody continued. The very welfare of the children itself must require the change. Hurley v. Hurley, Mo.App., 284

S.W.2d 72, loc. cit., 73–74; Schumm v. Schumm, Mo.App., 223 S.W.2d 122.

We, of course, give proper deference to the trial judge's action, particularly if the credibility of witnesses is involved, and we also take into consideration the fact that he sees the parties and witnesses first hand. We do not lightly disturb his judgment. Even so, it is the settled law and it is our clear duty to review the entire record, to correct any error the trial court may have made, and to enter such judgment as justice requires.

Upon our independent review of the record we have concluded that respondent father has failed to carry his burden of proof of showing a substantial change of conditions since the divorce decree adversely affecting the welfare of the children and requiring for the sake of their welfare that their custody be changed from their mother to him.

We mention briefly some of the reasons for our conclusion, although the facts themselves speak plainly. First, we notice respondent's motion failed to alleged what changes had occurred upon which he relied as justifying a change of custody. Rather, respondent merely says, "if conditions surrounding said minors have materially changed" he would like custody. This does not meet the well known requirements of a motion to change child custody that the changed conditions or new facts be pleaded.

Looking to the evidence, respondent says the fact Mrs. Siefkas married James Siefkas whom she had been dating while separated from her husband but prior to her divorce is such a change. Such dating, while certainly not proper, occurred prior to the divorce and the trial judge did not think it sufficient at the time of the divorce to cause him to conclude that it was not in the best interests of the children to place them with their mother. We are at a loss to understand how it could now have a different effect on that consideration than it had at the time of the divorce. Mrs. Siefkas' marriage to her present husband, if anything, appears to be a stabilizing influence and in no way derogatory of the best interests of these children.

It is also suggested Mrs. Siefkas is unstable as evidenced by her two moves since the divorce in one of which she took her children from the Boonville school to one in Maryville and that such moves are so detrimental to the children's welfare as to call for a change of custody. While it is possibly preferable, if circumstances reasonably permit it, to never move one's home and to keep one's children in the same town and school all their school days, it does not follow that occasional moves, dictated by one's occupation, of themselves require a change of child custody. In this modern day it is almost unusual for a working man or woman not to have some moves occasioned by employment transfers, employment advancements or for other justifiable causes. Such moves do not necessarily mean instability. Nor are they necessarily substantially detrimental to a child's welfare. Such moves, at most, are but circumstances to be considered along with all the other facts and circumstances bearing on the question of the welfare of the children. Viewed in the light of the record before us, demonstrating beyond reasonable dispute, that these are well adjusted, well cared for, normal, happy children doing quite well in their school in Maryville, we find no merit in the contention made above.

Also, some contentions of respondent involve the question of where the children go to church. Ordinarily it is the one who has the general custody of very young children and, hence, the basic burden and responsibility of rearing them to be fine men and women who, subject always to the paramount general consideration of the children's welfare, has the privilege of deciding what church the young children should attend until they are mature enough to decide for themselves. Annotation, Custody of Children—Religion As A Factor, 66 A.L.R.2d 1410, 1428(b). Normally, giv-

ing that privilege of choice to the one having general custody of young children is not detrimental to the welfare of young children but ordinarily is a reasonable, workable provision for obtaining for the young children desirable religious training. We find nothing in this record indicating the children's welfare has suffered through the exercise of this privilege.

Another suggestion is that Mr. Siefkas is severe in that he once or twice spanked the children. Certainly it is proper for him to assist in the normal discipline of the children, and the record convinces he is not overly severe with them but is understanding and kind in matters requiring their discipline.

Reference is made to the informal conference the children had with the judge. It is only natural that young children if they had their way would prefer to remain in their original town and school. We do not doubt they love their father. We are also convinced they love their mother who has had their continual care since their births and who has been a good mother to them. There is not the faintest suggestion in the record that this mother has done anything either unethical or immoral during any of the time properly in question. She has taken good care of these children, and they are getting along very well.

Mrs. Siefkas, in accordance with the provisions of the divorce decree, respectfully requested the permission of the court to take these children to Massachusetts. On this record we are unwilling to rule that the court abused its discretion and erred in refusing that permission. However, we are convinced the court erred in changing the custody of these children from their mother who has been taking good care of them to their divorced father who lives alone, and who would have to employ a housekeeper to provide much of their care.

For the foregoing reasons we find it necessary to reverse the judgment amending the original divorce decree so as to change

child custody and to order the provisions of the original decree reinstated in full. If respondent wishes to seek a reduction in the amount of child support established in the original divorce decree, which neither the trial court nor we have passed on, he is free to file an appropriate motion in the trial court in which motion he should allege the necessary ultimate facts he relies on to justify a modification to a lesser sum.

The judgment is reversed.

All concur.