Homer R. PATTERSON, Jr., (Plaintiff) Appellant,

v.

Delores M. PATTERSON, (Hager) (Defendant) Respondent.

No. 31551.

St. Louis Court of Appeals.

Missouri.

Feb. 18, 1964.

Leyhe, Jacobsmeyer & Meyer, R. W. Jacobsmeyer, W. H. Leyhe, III, Clayton, for appellant.

Charles M. Shaw, Clayton, for respondent.

RUDDY, Presiding Judge.

This is an appeal by the father of three minor children from an order modifying a decree of divorce wherein the trial court substituted provisions for the temporary custody of the children to defendant in lieu of visitation privileges.

The petition for divorce was filed on January 21, 1960, by the father, husband of the defendant, in which he alleged that he was married to the defendant on October 13, 1943, and that there were three children born of the marriage. The wife, defendant, filed an answer and a cross-bill for divorce.

On June 13, 1960, the Circuit Court of St. Louis County awarded plaintiff a decree of divorce. Prior thereto the plaintiff and the defendant had entered into a stipulation, in which, among other things, they disposed of their property rights and agreed that

plaintiff should have the custody of the minor children. The trial court in its decree did not refer to the provisions of the stipulation covering custody but decreed that plaintiff have the care, custody and control of the three minor children and "that said defendant have the right to see and visit said children at all reasonable times." The stipulation was filed in the cause.

On October 2nd, 1962, defendant filed her motion to modify the decree of divorce and asked that the custody of the minor children be given to her. In her motion to modify she alleged that since the rendition of the decree of divorce she has remarried and is now Delores M. Hager and is residing with her present husband who is gainfully employed and that she has an adequate home for her minor children. She further alleged in said motion that the plaintiff has refused to allow and permit her to have the right of reasonable visitation and, therefore, the children have been denied the right of the love of their mother. She further states in said motion that the welfare of the minor children will be improved should their custody be transferred to her.

After a hearing the trial court entered its order modifying the decree of divorce and in said order it eliminated and terminated the reasonable visitation privileges contained in the original decree and "further ordered, * * * that the defendant shall have the temporary custody of said minor children on the first weekend of each month from 10 A.M. on Saturday until 8 P.M. on Sunday and on the third Sunday of each month from 1 P.M. to 8 P.M." The court further ordered that the defendant shall have the temporary custody of said children on certain designated holidays.

In the points relied on by plaintiff he contends that defendant failed to prove substantial change in conditions since the entry of the decree of divorce; failed to prove that the welfare and best interests of the children required a change in custody, and, that it was to the best interests of the children to leave them in plaintiff's custody.

He also contends that the trial court erred in restricting his examination of defendant in certain respects and that the judgment entered by the trial court was beyond that permitted under the pleadings.

Two days after the decree of divorce was entered defendant married Robert F. Hager. A daughter was born of that marriage. She was 14 months old at the time of defendant's testimony. Defendant now lives in Cahokia, Illinois, in a home consisting of two bedrooms, a nice sized living room, kitchen and bath. She said that the baby's bedroom was very large in size in which there is a studio couch and that their living room was very large and in it there was a large couch that could be used for overnight sleeping. These sleeping facilities were in addition to the bedroom she and her husband occupied. It is the plan of defendant and her husband to purchase a larger home, and to assist in the purchase of a new home they have placed their present home for sale with a real estate company. The home she now lives in with her second husband was purchased four days after the decree of divorce was entered.

When defendant was questioned in her cross-examination about the relationship between her and her present husband prior to the divorce, she answered, "He was just a friend." She said that the love and affection that culminated in their marriage on June 15, 1960, developed within the two day period after the divorce. This was the fourth venture into the field of matrimony for Robert Hager. His three previous marriages culminated in decrees of divorce in favor of his previous wives. He has been employed by the United States Government for 19 years and is presently connected with the United States Army Transportation Materiel Command. His income at the time of the hearing on the motion to modify was $8270 a year. He thought that his wife's request for custody of the children was a wonderful thing, stating in his testimony, "I believe the children should be with their mother—any child should be with their mother."

Defendant professed a great love for her children and in her testimony she said that she never failed to send gifts to the children on their birthdays or at Christmas and had frequently sent gifts on the occasion of Easter and Valentine Day. When questioned about the last time she sent gifts to her children, she said that she took a large dinosaur to one of her daughters on her birthday and upon finding no one home at plaintiff's residence she took the gift to a next-door neighbor, Mr. Kearney, and asked him to deliver it to her daughter. She said that she misses the children very much.

When defendant was asked on cross-examination why she did not fight for the custody of the children at the time the divorce was granted if she really cared for them, she said that at the time of the divorce and for some years prior thereto she had suffered from a nervous breakdown and that approximately one month before the divorce she had concluded six weeks of shock treatment in a hospital, these treatments having been given to relieve her nervous condition. She said that during that period and for a time thereafter she was confused and would suffer blackout periods, which she claimed were caused from the shock treatments. She further said that she did not forget her children but because of her physical and mental condition, and particularly her confused state of mind, she was in no position to care for the children. When pressed for an explanation of why she married her present husband two days after the divorce she said that he had proved to be the only comfort that she had during this period. She said that she had spent various periods of time in the hospital for her nervous condition during the seven year period before the divorce proceedings. This physical and mental condition related by the defendant was confirmed in the testimony of defendant's present husband, who said that she had remained under the attention of a doctor for two or three months after their marriage. Defendant testified that at the present time her health is perfect, both mentally and physically, stating that she is not now under a doctor's care and that she had been released from medical attention in October of 1960 for the nerve condition.

Defendant denied having any problem with alcohol, admitting that on social occasions she would have one or two drinks in an evening. In her cross-examination, when questioned about drinking in the automobile while riding with her husband, she explained, that while riding " * * * down in Texas you drink in the car. They don't serve drinks over the bar." She said that she had never been intoxicated and that she had never seen her present husband intoxicated. Her husband denied that he drank while driving his automobile.

In connection with her visitation privileges, she testified that she has seen the children on one occasion and that this was the latter part of June 1960. On this occasion she went out to plaintiff's home to take the children on a vacation trip over the Fourth of July weekend. She testified, "When we got there we found out we could only have 15 minutes to talk to the children. They weren't allowed off the porch. Q. Who put these rules into effect? A. Mr. Patterson." She said that plaintiff insisted on supervising the conversation between her and the children and that he said that in the future her present husband would not be allowed on the ground and that defendant could come out and come into the house for one hour to visit with the children. She said that was the only arrangement she could make to see the children and her visit had to be in her former husband's house with him present for one hour and without her present husband being on the premises. She said that shortly after this first visit plaintiff took the children to California for almost a month and said that she attempted to visit the children "a couple of times afterwards" but they were not at home. She left a note in the door for the children but never received an answer.

In her cross-examination when defendant was questioned about the first visit, at

which time she said he gave her and the children 15 minutes on the porch under his (plaintiff's) supervision, she was asked "Did he tell you you had to leave?" She said he told us "You have got 15 minutes, and we left after 15 minutes." She further testified that when she told him the purpose of her visit, which was to take the children on the weekend trip, he answered, "No, they cannot go." Thereafter, defendant consulted an attorney with reference to the interference with her visitation privileges and he advised her not to go out to the plaintiff's premises on any more visits.

In her cross-examination when she was queried about her failure to visit the children again, she said, "All I know is that he had said that if he (defendant's husband) would even set foot on the property he would shoot him, and I repeated that back to my present husband." By this testimony she had reference to the statement of plaintiff that defendant's present husband could not set foot on the plaintiff's premises.

After her frustration in attempting to gain her full visitation privileges, defendant would call the residence of plaintiff and attempt to talk to one of the children and she said that "he (plaintiff) would always cut in on the other line." When he would cut in on the line he would make a slanderous remark and this would take place while the child was on the phone. On another occasion one of the daughters called defendant, which took place on a day the daughter was home sick from school, and while she and her daughter were talking over the phone, the daughter said, "I can't talk to you any more; I am not supposed to talk to you." The daughter then hung up and that was the last time that she talked to any of the children.

Defendant testified that one of the daughters was taken to the hospital and when in the hospital she asked her father (plaintiff) to call defendant, her mother, because she wanted her mother to come and see her. Plaintiff refused, telling the child, "I don't want your mother here" and "Don't bother your mother." On another occasion plaintiff learned that her son had broken his wrist. She was not notified of his injury, nor was she notified of the daughter's hospitalization. Defendant said she learned of these incidents through her mother and through Mr. Kearney who is the next door neighbor to plaintiff.

When questioned about her spiritual activities, defendant testified that at the present time she did not belong to any church, stating that they had visited four churches in Illinois, adding, "we have talked about getting the baby baptized and would like to join a church." She said that she would see to it that the children attended church if she had custody of them, adding, "I would probably go to church with them myself. I enjoy going to church."

On her cross-examination she was asked, "Did you attend church regularly when you were married to Mr. Patterson?" and she answered, "When I could. When you have three children and you have to have a meal ready so your husband can be on the job selling houses, you cannot go to church after cooking the meal and have everything at one time. I thought Rev. Gabler understood that." Defendant's present husband testified that if defendant was given custody of the children he would agree to take the children to church, stating, "we both would probably go with them."

Defendant further testified that to her knowledge plaintiff is not married and that no one is taking care of the children; that plaintiff has no housekeeper and only has a lady come in once a week to do the ironing and cleaning but that plaintiff and the children cook their own meals and take care of themselves. She thought the children's condition in life would be better if they had a full time mother.

The evidence adduced by plaintiff shows that he and the children live in a home consisting of two bedrooms, two baths, a family room, a living room, dining room and kitchen and a two car garage. The garage is attached to his home and serves as an office

for his business, which is that of a builder and constructor of homes. The construction work he is engaged in is performed within a block of his home and this building operation has been going on for several years. He estimated that 50% of his time was spent in his office.

Witnesses testifying for plaintiff described the home of plaintiff as very normal, and that the children did not appear to be lacking in any supervision. A cleaning woman comes in to the home one day a week for the purpose of taking care of the ironing and other basic cleaning needs. All witnesses testified that the children appear neat at all times, except possibly when they are playing; that they were not undernourished or underfed and thought that the home was as neat now as it was at the time of the divorce.

Plaintiff testified that he prepares all of the meals for himself and the children. He said he always knows where the children are whenever they are not at home and that he has no problem in the supervision of the children and that their home life is very happy. Plaintiff has the reputation in the neighborhood of being a very good father.

Rev. William C. Gabler, a clergyman, affiliated with St. Paul's United Church of Christ, affirmed the testimony of other witnesses that the children's general appearance and dress was very satisfactory and that the people in the immediate neighborhood of the plaintiff admired the way in which he handled the situation. He did not think that plaintiff was lacking in his responsibilities so far as the religious training of the children was concerned and described their attendance at church and Sunday School as good. He said the children were baptized in March of 1960, and since that date one of them has been confirmed and that the plaintiff was in attendance at the time of the child's Confirmation but that defendant did not appear. When the Confirmation took place does not appear in the witness' testimony. He said that since the date of the divorce the plaintiff has attended his church and his attendance record is very good, adding that he was a member of the Ushers Corps.

In his cross-examination he said that a good mother was necessary in the growth of a child and admitted that the defendant was undergoing shock treatments during a part of her married life with the plaintiff. When asked about defendant's failure to attend the Confirmation he admitted that he was not sure she was not undergoing shock treatments at the time. He further testified on cross-examination that the mother of the defendant did help plaintiff in taking care of the home.

Plaintiff testified that all of the children were in school and that their grades were average and that they had not missed school, except for illness. He stated that the children helped in the chores and house cleaning.

The court interrogated plaintiff and asked him what was the attitude of defendant in relation to the children when she was in the home regularly and on the occasions when she was not ill. Plaintiff answered, "You would probably have to go back two years prior to the divorce before I could give you a decent answer, because the last two years was very poor. Two years prior I would say that it was as well as I know it. I have only been married once. I don't know what another wife and mother would be like. So far as I know she was a good mother." We understand from this testimony that defendant was a good mother when she was not ill and not suffering from her nervous condition.

Again the court in its interrogation asked, "Now, the evidence indicates that whatever problems she has had she seemingly overcome it, at least she is not under a lot of medical care or physician's care, or anything of that nature. Do you have any solid feeling of apprehension that the children would not be well taken care of if she had them for temporary visits on occasions? A. Well, all I can do is speak on my personal convictions, and I would at any time ques-

tion the safety of my children with her. Q. For what reason? A. Primarily because of the last two years of my marriage." Again we interpolate, that in the last two years of plaintiff's marriage with defendant she was under medical care for treatment of a nervous condition and undergoing shock treatments.

In his cross-examination plaintiff said that he had no personal knowledge of facts that would cause him to believe that his wife would mistreat the children. However, at another part of his testimony he said he would question the safe return of his children because he had heard of excessive drinking on the part of his former wife. When pressed as to who told him that she drank to excess, he said it was his next door neighbor, Kenneth Kearney.

Kenneth Kearney testified that on one or two occasions since the divorce he has been with defendant and her present husband. On one of these occasions while enroute from defendant's husband's home to the home of his brother, witness testified that some drinking took place in the automobile. He said that on this occasion he became concerned about defendant's baby and remarked, "You better let me hold the daughter." When questioned why he made this remark, he stated that "I don't know—it wasn't a case of a matter of life and death—No." On cross-examination he said defendant's husband was driving in a safe and careful manner, was sober and was not "endangering anyone's life."

Plaintiff denied that he limited defendant's visit to the children, as stated by defendant, to only 15 minutes. He explained, "As I recall it, they more or less timed themselves and said it was time for them to leave, and I didn't say they had to leave. I don't think they even stayed 15 minutes." He admitted that he told the defendant that she was welcome to visit the children at any time she wanted to but that Mr. Hager was not allowed on his property. He gave as his reason that he felt Mr. Hager was partially instrumental in the cause of the di-

vorce. He did not remember threatening to shoot Mr. Hager. Plaintiff said the only other time that defendant attempted to see the children was when she asked to take them on a fishing trip over the Fourth of July weekend. He said he refused to let them go on that occasion because his boy did not want to go and because the boy did not want to go he did not want the girls to go. He gave as his reason for this refusal that defendant and her husband were going to fish in a boat and he knew that accidents could happen in boating and that his boy had passed the life-saving course with the Scouts and he wanted him along for his own peace of mind and for the safety of the girls.

Plaintiff denied telling the children they could not call their mother but did tell them not to talk too long because it was a toll call. He denied interrupting the conversation at the time the child was talking to the mother over the phone, explaining that he was not at home at the time. He concluded his direct testimony with the statement that he has never refused his wife the right to visit the children.

■ We said in the case of Neustaedter v. Neustaedter, Mo.App., 305 S.W.2d 40, 1. c. 43, that it is our duty to review the whole record and we must decide the matter before us on its merits, having uppermost in mind the predominant rule that the best interests of the child must be served. Also, we must be mindful that defendant had the duty to show changed circumstances and conditions since the original decree of divorce was entered which, in the best interest of the minor child, required the original decree to be modified. Wilson v. Wilson, Mo.App., 260 S.W.2d 770; Brake v. Brake, Mo.App., 244 S.W.2d 786, 1. c. 789; Hirsch v. Hirsch, Mo.App., 366 S.W.2d 484.

■ In this case the defendant has the burden of proof of showing by a preponderance of the credible evidence that there has occurred changed facts and circumstances which in the best interest of the children re-

quire modification of the original decree. Rutstein v. Rutstein, Mo.App., 324 S.W.2d 760; Hirsch v. Hirsch, supra. The welfare of the children is without exception the basic and principal consideration to which the parents own wishes and personal desires must yield if opposed to such welfare. Lewis v. Lewis, Mo.App., 301 S.W.2d 861.

■ In our consideration of this case we review the whole record as in cases of an equitable nature and decide the case on its merits according to the interests of the child, having in mind a proper deference for the findings of the trial court on the disputed questions of fact where matters of credibility of witnesses are involved. However, it is our duty to correct any errors the trial court may have made, and to enter such judgment as justice required. Wilson v. Wilson, supra; Hirsch v. Hirsch, supra; Shepard v. Shepard, Mo.App., 194 S.W.2d 319.

We find no evidence in this case to indicate that either party is unfit to have, either the temporary or permanent custody of the minor children involved. It is true plaintiff expressed some fear that the defendant was drinking to excess, which fear had its foundation in a statement he heard from one of the neighbors. This neighbor when placed on the witness stand did not support the fears possessed by the plaintiff. While defendant may have been physically and mentally unfit to care for the children at the time of the entry of the decree of divorce, there is nothing in the evidence presented at the hearing on the motion to modify which would show or tend to show that she had not recovered from the illness she had at the time of the divorce proceedings and was not now in good physical and mental condition. The uncontroverted evidence in the record shows her to be mentally and physically fit at this time to have the temporary custody of the children. We think the evidence concerning her physical and mental condition at the time of the divorce proceedings and at the time of the hearing on her motion to modify shows a changed condi-

tion and circumstance since the original decree of divorce was entered.

■ Therefore, where both parents are proper and fit persons, both of them have the right to reasonable access to the children and in fact the children's best interests will be served by making it possible for them to receive the benefits derived from association with both of their parents. Schumm v. Schumm, Mo.App., 223 S.W.2d 122; Lewis v. Lewis, Mo.App., 301 S.W.2d 861; Olson v. Olson, Mo.App., 184 S.W.2d 768. We think it is beyond question that benefits will inure to the children from their association with their mother, where there is no question of her fitness to have the temporary custody of the children. Under the facts as shown in this case, these children should not be denied the companionship, affection and guidance of their mother.

In connection with the testimony concerning defendant's attempts to visit the children, some conflict appears in the record. The trial court must have resolved this conflict in favor of the defendant and we defer to the trial court's findings in that respect for the reasons heretofore given.

■ Defendant's testimony shows that the conditions prescribed by the plaintiff governing her visits to the children, wherein she had to visit them in plaintiff's home for one hour with him present and without her present husband, amounts to a denial of the privacy which was to be desired in such a situation. These terms, together with the directions by plaintiff to the children that they were not to call their mother on the telephone and his refusal to call the mother when the daughter was in the hospital, shows an attitude on the part of the plaintiff which is not conducive to a proper execution of the visitation privileges accorded defendant.

It was held in the case of Rutstein v. Rutstein, supra, that if one parent's conduct in regard to the children is such as to deprive the other parent of her right to temporary

custody or of visitation, such fact will be ground for modification.

In the case of Shepard v. Shepard, supra, the court said:

"In the very recent case of Olson v. Olson, Mo.App., 184 S.W.2d 768, the St. Louis Court of Appeals discussed the effect of one parent, who had been awarded custody of the child, refusing to permit visitation by the other parent, as authorized by the decree. That court said (page 773): 'Where the one parent acts in disregard of the decree so as to deny the other parent the rights he has under it, the court is not restricted to mere punitive measures, but may modify the decree in such a manner as to insure the carrying out of those provisions which it conceives to be for the best interests of the child.'" (194 S.W. 2d l. c. 319.)

■ We think the record in this case shows a change of conditions and circumstances since the rendition of the decree of divorce, namely, the improved physical and mental condition of the defendant and her fitness now to have the temporary custody of the children and the action of the plaintiff which constituted an interference with the trial court's decree awarding visitation privileges. We think it for the best interests of the children for the court to spell out as it did the visitation rights through its order of temporary custody. We see no need to further specify the contentions made by plaintiff in the argument portion of his brief. We feel that what we have said heretofore is a sufficient answer to all of the contentions and arguments raised by plaintiff.

■ In his next point plaintiff contends that the trial court erred in restricting the examination of defendant to matters occurring after the divorce. In support of his contention he cites the case of Drew v. Drew, Mo.App., 186 S.W.2d 858, which was a case decided by the Kansas City Court of Appeals. The portion of the opinion in the Drew case, relied on by plaintiff, which seems to permit the introduction of evidence showing character and conduct of the parents prior to the divorce decree was specifically overruled by the Kansas City Court of Appeals in Shepard v. Shepard, supra, wherein the court said:

"In Drew v. Drew, Mo.App., 186 S.W. 2d 858, this court discussed the opinions in Sanders v. Sanders, supra, and Meredith v. Krauthoff, supra [191 Mo. App. 149, 177 S.W. 1112], and in so doing used language which seems to authorize the trial court to hear and consider evidence relating to the character and conduct of the parents prior to the divorce decree, but this is merely obiter dictum and should not be followed." (194 S.W.2d l. c. 324).

As said in the Shepard case only new facts and circumstances arising after the entry of the original decree of divorce can authorize a change in custody of children. The court said in the case of Shepard v. Shepard, "The true theory upon which the rule requiring a showing of new facts or changed conditions rests upon the doctrine of res judicata." (194 S.W.2d l. c. 323.)

Plaintiff also cites the case of Meredith v. Krauthoff, supra. The facts in that case are not analogous to the facts in the instant case. It will be seen from the facts in the Meredith v. Krauthoff case that the trial court was considering for the first time the question of the custody and welfare of the child. There had been no prior adjudication of that issue. Under such circumstances it was proper to hear evidence pertinent to the fitness of the parties both before and subsequent to the divorce decree.

■ Finally, plaintiff contends the court erred in rendering a judgment beyond that permitted under the pleadings. Defendant prayed for an order "modifying its original decree, transferring the custody of the minor children to the defendant." Plaintiff contends that the trial court could only enter an order of permanent custody under this prayer and had no jurisdiction to enter

an order of temporary custody, citing Poole v. Poole, Mo.App., 287 S.W.2d 372. The Poole case merely held that it appeared from the face of the record that there was no pleading in the case calling for the exercise of the court's jurisdiction to make an award of support and maintenance and for that reason held that part of the judgment void. Defendant's motion raised the issue of custody and, therefore, the trial court had jurisdiction to make any order touching custody that would serve the best interest and welfare of the children.

We find no error. The trial court's order and judgment is affirmed.

WOLFE and ANDERSON, JJ., concur.