298 S.W.2d 67 (1957)
S----, Plaintiff-Respondent,
v.
G----, Defendant-Appellant.
No. 7505.
Springfield Court of Appeals, Missouri.
January 30, 1957.
*68 *69 Louis Kranitz, and Theodore M. Kranitz, St. Joseph, Elza Johnson, Carthage, for defendant appellant.
McReynolds, Flanigan & Flanigan, Carthage, for plaintiff respondent.
RUARK, Judge.
This case involves the custody of a child. We have an appeal from an order modifying (but not in the manner prayed for) a decree of date March 7, 1953, which original decree granted the father, who was plaintiff then but is respondent in this appeal, divorce and custody of the daughter of the marriage (then seven years old and nine years old at the time of the hearing on the motion here involved), except for a period extending from June 1 to August 1 annually and except for alternate weekends; the plaintiff also to pay the mother (who was the original defendant and is the appellant here) the sum of $5 per week during her period of summer custody. The record is not clear as to the grounds upon which the divorce was rendered, but we surmise from remarks of counsel that it was probably "general indignities." The parties to this original decree entered into a settlement whereby the father agreed to pay the mother $300, and the father took the home and family automobile. The decree was taken, without contest, after defendant mother had, by her attorney, filed answer.
On January 3, 1955, the mother filed her motion to modify. By amended motion she alleged that at the time the original decree was rendered she was not financially able to provide a home for her daughter but that since then there had been changes in circumstances in that (a) she had remarried and was now able to provide a home, (b) the father had also remarried and he and his present wife were maliciously attempting to poison the mind of the little girl against her mother, (c) the father and his present wife had wrongfully refused to permit visitation with the child as provided by the decree, (d) had made unreasonable requirements as a condition of visitation, (e) intercepted and prevented correspondence between the mother and child, and (f) the father had refused to pay the support of the child during summer custody of the mother as required by the decree.
At hearing upon the motion here involved it was developed, over the objection of the mother, that prior to the divorce she had become involved in an intrigue with a man of the community, then married, which man we will refer to as the doctor. There is no evidence of "immoral conduct," as such expression is generally used, between the mother and the doctor. There was evidence of conferences or meetings between the two, to such an extent that both parties to this affair acquired a bad reputation with their acquaintances in the neighborhood in which they lived. At the request of the father there was a separation and the mother shortly went to Kansas City, where she lived with a sister and eventually found employment. At some approximately near time the doctor also left the community and eventually reestablished himself in his profession in North Missouri. The trial court had sufficient ground to believe that misconduct of the mother with the doctor was the principal or at least a contributing cause for the breaking up of this one home, and possibly also the home of the doctor, for about June 1954 he was divorced from his then wife, who received by decree of court care and custody of their son, age about twelve years at the time of the occurrences herein to be mentioned. On July 10, 1954, the mother and doctor were married and have established their home in *70 North Missouri, where the doctor now practices and is moderately successful in his vocation. The mother (and the doctor) are now financially able to provide a comfortable home for and educate the daughter. The doctor has expressed a desire to do this. After the marriage of the mother and the doctor they first lived in a four-room house, then moved to an apartment of three large rooms and about the time of the hearing on the motion had acquired some property and were fixing up part of it for the doctor's office and the remainder for living quarters. The deputy juvenile officer of that community, at the request of the circuit court, made an investigation and inspection of the three-room apartment occupied by petitioner mother and the doctor at the time. This officer of the court highly recommended it as a desirable home for the daughter. The mother and her present husband have "rededicated" themselves to the service of God in their chosen church, the mother having asked for and received baptism anew. Both of them are now active and faithful workers in the church and were earnestly commended by their present pastor, who journeyed to the place of trial and testified in person. In addition they produced the depositions of nine residents in the locality of their new home who testified that their reputation is good.
The father has remained at his employment in his home town, proved an unquestioned reputation, is of modest means but has a comfortable new home, which is well-kept, and is able under the present circumstances to furnish the daughter with all that is essential for her well-being, although he appears to be somewhat burdened with debt. The child is in school, attends Sunday school and church regularly, is kept neat and clean and appears to be reasonably happy in her present surroundings. The evidence further shows that the father has always been a fond and devoted parent. He has performed many things (such as bathing and dressing the child), even before the divorce, which are ordinarily considered as falling within the sphere of the mother. There exists between the father and the child a close and intimate bond of affection.
At first the father and mother were able to handle their problems of exchange of custody and visitation without difficulty. The father visited the child when the mother had summer custody, was made welcome and apparently permitted to make a happy occasion out of it without interference from the mother. In May 1954 the father married his present wife. Trouble started about that time.
We learn about the present wife largely from her deposition, which was taken approximately two months before the hearing on the motion. At the hearing proper, attorneys for the petitioner mother were unable to get the stepmother upon the witness stand, although they had subpoena issued for her. She was, at that time, suffering from (we use the language of the father's attorney in quoting the doctor) "butterflies in the stomach." In her deposition she testified she was thirty-three years old. She said she was once married and divorced. She said this divorce was in the year 1946. A certified copy of the decree placed in evidence shows her to have obtained a decree of divorce in 1951; whether this is the divorce she referred to we do not know. She said that from 1946, when she got her divorce, until 1954 she lived in Texas, where she was a waitress in a cafe which she says "was the classiest place in town until they built the coffee shop across the street." In her deposition she further stated there were no children of her former marriage; yet the decree of divorce in evidence shows there to have been a daughter of the marriage, age ten years at the time of the decree (1951), which daughter was awarded to her custody. Upon the witness stand the father was asked if he knew of this child of his present wife. He said he did; that he did not know the present whereabouts of such child but knew where she was supposed to be; that such child had never been to his home and did not correspond with her mother; that he knew of no modification of *71 the original decree which changed the custody of his wife's daughter. So much for the background of the parties.
Changes of Condition
The father admitted that he refused to pay the support money in the original decree, after the mother remarried, until after the motion to modify was filed and he was, quite properly, advised by his attorney so to do.
As to interference with communication between mother and child: The mother testified she would telephone the residence of the father and ask for the child whose custody is here involved and would be told that the child was not present. This the father denied. He claimed that the mother had never called the child except for one time after the separation and before the divorce. The father also denied interference with correspondence between the mother and daughter. His present wife testified (in her deposition), referring to the fact that the mother formerly wrote to her daughter at home, that "that practice does not continue." She professed not to know the reason why. It is clear from the evidence that at some period the mother commenced a correspondence with her daughter through the daughter's schoolteacher (who was a witness) and that the teacher was requested by both the father and his present wife to discontinue aiding such correspondence.
Christmas Eve, 1954, fell on Friday and it was the mother's alternate weekend to have her child. She had written but a few days before that she would call for the child. On this occasion at 5:30 p. m. she went to the father's home, but he met her at the door with a refusal. He told the mother he intended to keep the child on that Christmas because she had had her with her on the previous Christmas. The mother then asked if she could see the child and give her her Christmas presents. This was refused. The reason assigned was that the child was in the bathtub. The mother then requested permission to wait in the car so that the child could come out to the car and open her gifts. This also was refused. She asked to wait at the door in order to see her child. This was refused. She went out to the car and returned and asked the father, "What could I do that you would cooperate for the sake of the child?" He said to her, "You've done all you can do." The mother reminded the father that she had come a long way (from North Missouri) to see her child. The father said, "You should have thought about that three years ago," and latched the screen against her. At this point his (present) wife called and told him to "come here." The father said, "You can have her next week," and shut the door. The deposition of the father's present wife concerning this affair sheds some light. This witness agreed that it was the mother's weekend to have the child and that she and her (present) husband had received a letter earlier in the week advising that the mother was coming for the child. She knew the father did not intend to let the mother have the child but did not inform her ahead of the trip from North Missouri, because "that's not any of my worry." In describing the incident when the mother was pleading with the father to permit her to see her daughter on Christmas Eve, she said that the mother said, "I want to see her for a minute," and that "My husband said she was in the bathtub, and then she said, `Why can't she just come out to the car and I will give her her presents.' Then she * * * started bawling." On Christmas Day this present wife wrote to the child's mother. We will not set forth all of the contents of this letter. Suffice it to say that it was not a Christmas missive. It was spiteful and threatening. Among other things, it told the mother never to set foot on the property again and concluded with the statement:
"So if you expect to see * * * (the child) again you had better find another picken up place, down on the corner. You drop me a card and let me *72 know the exact time. If not there on time she won't be there, so it won't be my fault if you don't get her, so you had better know the exact time. I'm sure it don't matter to me. If you didn't like to show off so well this might have been pervented. I'd hate to show my face if I was you around here. You should hear the talk about you."
The father testified that he knew his present wife wrote this letter and that he asked her not to mail it, but apparently he was not the master of his household in that respect. The following weekend the mother met her daughter in front of a house up the street. At least once thereafter she saw her daughter by visiting the child at school.
As to the charge that the father and his present wife are attempting to poison the mind of the child against her mother: The mother testified that the child told her she had been forbidden to mention the mother's name in the home. That the child asked her what the word "bitch" meant, because that was the way her stepmother referred to the mother. She testified that on another occasion the daughter told her that her father threatened her (the child) that he would "disown her as a daughter" if she came to live with the mother. Both the father and stepmother denied attempting to influence the child against her mother. Referring again to the stepmother's deposition, she said she told the child "a few things that were true."
"Q. What were those things? A. That her mother should not have taught her to lie.
"Q. Did you tell the child that her mother should not teach her to lie? A. Yes, sir.
"Q. How do you know that her mother taught her to lie? A. * * (The child) told me herself.
"Q. She told you that her mother told her to lie? A. Just the same she told me that her mother put her up to it. For instance, one letter she got at school and her mother told her, I will call you again Friday, and I said, has your mother been calling you, and she said no, she hasn't. I told her, you've been going to Sunday school and you got saved and baptized, and now are you going to stand there and tell lies, and finally, she told me that here mother was calling her at school."
The father testified that he kept down talk about domestic difficulties (and this is understandable) in the home as much as possible. He swore he never spoke to the child about her mother. But in his deposition taken previously he had already testified:
"Q. You have talked to the child against her mother and about her moral reputation, isn't that a fact? A. Nothing but the truth.
"Q. I asked you if you haven't talked to the child about her mother's moral reputation? A. I am stating what I have stated to the kid.
"Q. What have you stated to her? A. The truth.
"Q. What is the truth? A. The kind of mother she was.
"Q. What kind of a mother was she? A. No good, a whore.
"Q. That is what you have told the child? A. No. You asked me what kind of a mother she was.
"Q. You state you have told the child the truth? A. Yes, so far as I have told her.
"Q. What have you specifically told the child that is the truth? A. The truth. I object. I won't answer."
He admitted he had remarked or complained to the child concerning the mother *73 causing him so much expense and that because of that he could not get the child some of the things she wanted. He told her that the case (presumably the motion to modify) was coming to court, that it would be left up to her (the daughter's) decision and if she were called on the stand she would have to tell the court the way she felt; that she (the daughter) would have to choose which one she was going to live with. He admitted that he told the schoolteacher to forward all of his daughter's letters to his home and refer all telephone calls to his home. The daughter herself, when placed upon the stand under circumstances later to be mentioned, testified:
"Q. You love your mother, * * ?
"A. Not very well.
"Q. Why don't you love your mother, * * * ?
"A. She didn't care nothing about me. She just wants to cause my daddy and * * * (his present wife) lots of money."
Again:
"Q. Your daddy never said anything about your mother to you? A. No, he said that she didn't like me and I believe him.
"* * * * * *
"The Court: Who said she didn't like you?
"A. My daddy, and I know she don't.
"Q. And if your mother told you she loved you very much, * * *, would you believe her?
"A. No, because she don't."
At the conclusion of the evidence, except that later to be mentioned, the court indicated his view that although the mother had proved a change of condition in respect to ability to care for the child, such change was of short duration and there was still doubt in his mind as to whether it would continue. He called attention to the fact that the child was already in a good home and that any change of custody would be difficult for the child. On the 27th day of May he entered his order leaving the original decree to stand in most respects but modified it by giving the mother custody one week at Christmastime every other year and by specifying a place (the home of plaintiff's mother) for delivery of custody of the child.
Thereafter on June 3, 1955, by agreement of counsel the case was reopened in order that the court might hear testimony of the little girl; this because of information not available to either party when the case was tried and of such nature as to cause them concern. Accordingly, by agreement, the parents of the child were excluded (counsel were present) and the court himself examined the child. We do not desire to set forth more than the bare substance of this testimony. The sum effect of this is that the doctor's son, age approximately twelve years, large for his age and twice the weight of the child whose custody is here involved, was from time to time permitted by the doctor's ex-wife to visit in his father's home. On one of these visits, which covered a period of a month and a half in the summer of 1954, and at a time when the mother had summer custody of her daughter, this boy had on several occasions taken sexual liberties with the child. The circumstances were such that these acts were obviously not with the knowledge of the mother or her present husband. The child stated that she first told about these occurrences "after the real court was over," which was approximately a week before this (second) hearing. An eminent physician of the locality testified that he had recently examined the little girl; that she related such a history to him; that his examination revealed a physical condition consistent with and corroborative of her story of the assaults, although not necessarily proof of such. The child witness also related a careless habit on the part of *74 the doctor in going about the apartment home unclad at night and after the child was in bed and supposedly asleep. The judge, obviously disturbed by the facts developed and called upon to exercise the wisdom of Solomon, made a final order as follows:
"It is therefore ordered by the Court that the defendant shall have the right to have the child * * * in her custody once each month from 5:00 p. m. on Friday until 5:00 p. m., on Sunday, said time to be agreed upon by the plaintiff and defendant, and she shall have custody of said child from July 1st to August 15th of each year. All custody granted defendant is on condition that at no time shall * * * (the doctor's son) be permitted to be in the presence or company of * * * (the child here involved), that said child shall not be taken from the State of Missouri.
"It is further ordered by the Court that the modification order of May 22, 1955, granting defendant the right to have said child on alternate Christmas vacation beginning December 23 to December 30th, 1955, and on alternate years thereafter is hereby re-instated as a part of this modification. Other orders of original decree, not changed by this order, to remain in full force and effect; and that the costs of this motion be taxed to and recovered of and from the defendant."
Opinion
Appellant makes twelve assignments of error, one of which is based upon the fact that respondent filed no answer to the motion to modify. As we understand this contention it is that an answer affirmatively praying for (additional period of) custody is necessary to the validity of an order awarding such (additional) custody. No Missouri authority which supports this idea is cited. The power to adjudge custody, while statutory, is an inheritance from the ancient ecclesiastical courts, and under our statutes when the court has once acquired such jurisdiction the child becomes its "ward" and the court has jurisdiction to award custody "to the exclusion of all others."[1] A child is not a horse or dog to be won or lost depending upon the wish or whim of some person to be stated, or not stated, in a pleading. In such a proceeding four persons are involved, the two adversaries, the child (who stands to win or lose the most) and to some extent the public. Once the issue of the welfare of the child has been submitted to the court, that court must of necessity make such orders as are proper to accomplish such welfare, and technical objections in respect to pleadings on a motion to modify should not prevent a decision on the merits. Technical rules are not given serious consideration. Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458. The court may award custody even though no request therefor has been made in a petition.[2] And the books contain many cases where the court has disregarded the prayers of both parties and awarded custody in a manner not asked for by either. We hold against appellant on this point.
Another contention is that the court erred in receiving testimony concerning the conduct of the mother with the doctor prior to the divorce; that the decree was res judicata as to all matters which had transpired previously and therefore the evidence was not admissible.
The courts have been at some uncertainty as to just how far the inquiry *75 in respect to past affairs may go on a motion to modify.[3] Certainly matters which were or could have been adjudicated may not be relitigated in the motion.[4] The decree of divorce harvested the then rights of the parties, sorted and put them into separate bins; but the power of the court to modify its decree in exercise of control over the welfare of the child is a separate new growth which becomes a living thing immediately behind the scythe blade of the original decree. Such power, to modify because of changed circumstances and conditions, never became res judicata, because it was not a part of the original harvest.
When confronted with a question of custody the court must determine, first, whether there has been material change of circumstances and conditions and, second, whether such changes call for a shift of the custody in order to promote the best welfare of the child. As to the first of these, i. e., has there been a change of circumstances, it is imperative that the court which is trying the issue have knowledge of what the conditions were at the time the decree was rendered. How else could the court determine whether there has been a "change"? Practicing lawyers know that in many divorce cases the specific complaints are numerous, and usually the court does not make specific findings of fact but simply renders its decree from a sum total appraisement of the whole affair. The trial judge may or may not believe some or all of the charges to be true, or he may believe some of the conditions charged exist in greater or lesser degree than others. When a motion to modify comes later it may be determined by a different judge, or by the same judge, who may have forgotten the facts. If there exists any finding of specific fact he may have recourse to this and inquiry need go no further in this respect; but if no such specific finding of fact exists he must of necessity acquire information as to the condition of affairs at "the beginning period."
As to the second phase of the inquiry, will the well-being of the child be promoted by a change in custody, the very nature of the question demands an inquiry broad enough to reach every facet of the paramount issue, to-wit, the welfare of the child. In In re Wakefield, Mo.Sup. (in banc), 283 S.W.2d 467, loc.cit. 473, the court said:
"(U)pon the hearing of such a motion the court may consider not only changed facts and circumstances, but also material facts existing at the time of the decree but unknown to or concealed from the court." (See cases cited.)
In Hurley v. Hurley, Mo.App., 284 S.W.2d 72, loc.cit. 74, we stated that "the morals of the respective parents properly became the subject of inquiry as an important factor to be considered in determination of the motion to modify." (See cases cited.) In Dansker v. Dansker, Mo.App., 279 S.W.2d 205, the St. Louis Court of Appeals went extensively into the personal and moral life of the father and the medical history and experience of the mother in order to determine the present fitness, and concluded by denying the custody to both of them. In Rex v. Rex, Mo.App., 217 S.W.2d 391, 394, the Kansas City Court of Appeals explored at great length the relationship of the mother with another man (whom she afterward married) prior to the divorce, remarked, "We are not convinced that her relationship with Jakubaitis was an innocent one," and denied her motion to modify.
*76 We conclude that each case must stand upon its own factual situation; that the inquiry in respect to circumstances prior to the decree should extend so far, and only so far, as is necessary to inform the court of the actual situation and circumstances which existed at the time the decree was rendered, also as to those traits of character (and in some instances physical or mental conditions) which might be of permanent nature or which are so recent in occurrence or demonstration as to leave the possibility of their continued existence, which traits of character are of such nature that there is a reasonable probability that they may affect the welfare of the child. Applying such rule to the present case, the alleged misconduct of the mother with another man was of such recent existence and was of a nature that, if it did not show moral character, it at least carried an indication in respect to instability in domestic affairs, and we are of the opinion that the court was quite correct in receiving and considering such evidence. On the other hand, the father also offered some evidence in regard to laxness of the mother, his former wife, in having permitted dirty dishes to accumulate and in failing to sweep under the bed. We think this last mentioned evidence had little to do with the question with which we are here concerned, was too remote and was an intrusion upon matters which had become res judicata in the divorce case. We do not consider such evidence in determining the question which we have to decide.
Certain other assignments may be grouped as going to the sufficiency and weight of the evidence. One of these is failure to comply with the orders of the court. The admitted conduct of the father in refusing to make the support payments was a disregard of the lawful orders of the court; so also do we believe that the unwarranted obstruction of communication between the mother and daughter, likewise the refusal to permit the mother to take the child at a time when she had right of visitation under the decree, was an indication of lack of responsibility and respect for the court's orders. We can understand the wish of the father to have the child with him on Christmas, particularly when she had been with the mother on the preceding year; but if he honestly thought the decree under which the custody was divided to be wrong, he had his remedy of applying for modification. He had no right to accomplish the modification by exercise of superior force or position. Interference with or deprivation of visitation privilege as ordered by the court is a disrespect of the decree to be considered in passing upon a motion to modify, can be a change of condition and is a factor to be weighed in determining the welfare of the child.[5] And the decree may be modified in such manner and so as to insure the carrying out of the court's orders.[6]
As to attempting to destroy the affection of the child for the mother: We are of the opinion that the father and the stepmother, both consciously and unconsciously, have tried (partially successfully) to poison the mind of the child against her mother. We think this is apparent from their own testimony and from the testimony of the little girl herself. The courts regard the continued association of the child with both parents, wherever not forbidden by harmful circumstances, as desirable and something to be strongly protected whenever possible.[7] And conduct of one parent which seeks to instill fear, disrespect or hatred of the child for the *77 other is most strongly condemned. It is sufficient ground for ordering a change of custody.[8] In Kaplun v. Kaplun, Mo. App., 227 S.W. 894, the court said:
"It is of that age when most sensitive to influence, and no argument can arise over the proposition that it is detrimental to the child to have any one, especially its father, speak abusively and disrespectfully of its mother."
A little girl is entitled by right of her childhood to adore and look up to her mother, to love her mother, to know beyond any doubt whatsoever that such love is returned in the fullest sense. The conduct of the father in striving for (and permitting) destruction of this child's natural right is reprehensible. Such conduct incurs the danger of psychological trauma which could leave scars on the personality of the child far more serious than the scars which might be left upon her physical body had he beaten her. Were this the only thing we had to consider in this case we would unhesitatingly order the decree modified so as to remove the possibility of further misconduct in this respect. And if this course of action is continued it may yet be necessary for a court to do so.
Appellant also contends that a perjurer is not a fit person to have custody. This is true. Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 328. The relationship of the person alleged to have perjured herself, to-wit, the stepmother, to the household is so close that any perjury on her part would be an item necessary to be considered. We are not absolutely certain whether the misstatements under oath may have been due to ignorance or misunderstanding rather than wilful lies. In any event, we consider such misstatements and weigh them along with all other things.
On the other side of the ledger is the fact, as indicated by the trial court, that the time between the remarriage of the mother (July 1954) and the time she filed her motion to modify (January 1955) was short; and between such marriage and date of hearing on the motion (May 6, 1955) she and her husband had occupied two living quarters and were engaged in moving into a third. As we have stated, the breaking up of the former home at least indicates instability. It is rather crowding time to expect the court to disregard all other things and find not only that the present home is now stable but that it will continue to be. Time alone can answer that question. The welfare of the child is so important that a change of condition should not be found and custody awarded on speculation or experimentation.[9]
Finally, as to the sexual assaults made by the son of the stepfather while in the home which now seeks to take the child: While neither the mother nor the stepfather had knowledge of such assaults, nevertheless they occurred in that home while the daughter was in their charge and care. We cannot permit opportunity for this to reoccur.
In passing upon the question of custody the welfare of the child is the paramount issue and the ultimate goal to be reached by the decision.[10] Sympathy and consideration for the wishes of the parents must be disregarded when they conflict with what is best for the child.[11] In making our determination we commence with the presumption that the child was with *78 the right party at the outset because that is where the court had placed it. There must be evidence which overcomes this prima facie status.[12] The court may not order a change of custody simply because there has been a change of condition. It must also appear that the change is such as calls for the modification of the decree in order to promote the welfare of the child.[13]
We have attempted to balance all of the pro's and con's of the case, and we have put into the scales the frequently stated truism that, all other things being approximately equal, the custody of a female child of tender years belongs with the mother.[14] Our conclusion in substance agrees with the final judgment rendered by the trial court. However, we think the order, as last made, effectively limits the summer custody of the mother so that the child cannot, at any time, be or remain in the presence of the stepbrother, thus protecting the child against the possibility of any future assaults. Hence there was no reason to further shorten the period of summer custody from that which was originally decreed and again fixed in the order of May 27, 1955, after the main hearing on the motion to modify. We believe that the commencing date of such summer custody should be restored to June 1, but that in all other respects the judgment of September 9, 1955, should be affirmed.
The final assignment of error is directed to denial of appellant's motion for suit money and attorney's fees. The allowance or refusal of such is a matter for the sound judicial discretion of the court under all the circumstances and will not be disturbed except upon palpable abuse of this discretion.[15] It appears from a survey of the evidence that the appellant is now in better financial shape to bear this expense than is the respondent. The contention is overruled.
The judgment is modified by fixing the commencement date of the mother's summer custody at June 1 instead of July 1, and as so modified is affirmed.
McDOWELL, P. J., and STONE, J., concur.
NOTES
[1] In re Krauthoff, 191 Mo.App. 149, 177 S.W. 1112, 1118; Bell v. Catholic Charities of St. Louis, Mo.App., 170 S.W.2d 697; Morgens v. Morgens, Mo.App., 164 S.W.2d 626, 632.
[2] 27 C.J.S., Divorce, § 317, p. 1195, § 315, p. 1181; In re Morgan, 117 Mo. 249, 21 S.W. 1122, 22 S.W. 913; see Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 781.
[3] See Drew v. Drew, Mo.App., 186 S.W.2d 858, 865; Davis v. Davis, Mo.App., 192 S.W.2d 41, as opposed to Shepard v. Shepard, Mo.App., 194 S.W.2d 319; Martin v. Martin, 233 Mo.App. 667, 125 S.W. 2d 943.
[4] Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458; Hawkins v. Thompson, Mo. App., 210 S.W.2d 747, 751; Brake v. Brake, Mo.App., 244 S.W.2d 786.
[5] Cherry v. Cherry, Mo.App., 272 S.W.2d 700, 705; Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 780; Williams v. Williams, Mo.App., 211 S.W.2d 740, 742.
[6] Green v. Perr, Mo.App., 238 S.W.2d 924; Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 327; Olson v. Olson, Mo.App., 184 S.W.2d 768, 773.
[7] Hensley v. Lake, Mo.App., 274 S.W.2d 493, 495; Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 125; Lambert v. Lambert, Mo.App., 222 S.W.2d 544, 548.
[8] Rone v. Rone, Mo.App., 20 S.W.2d 545, 549; Fago v. Fago, Mo.App., 250 S.W. 2d 837; Luethans v. Luethans, Mo.App., 243 S.W.2d 801, 803.
[9] Irvine v. Aust. Mo.App., 193 S.W.2d 336, 342; Stricklin v. Richters, Mo.App., 256 S.W.2d 53.
[10] In re Wakefield, Mo.Sup., 283 S.W.2d 467; Samland v. Samland, Mo.App., 277 S.W.2d 880; Frame v. Black, Mo.App., 259 S.W.2d 104.
[11] Ackermann v. Ackermann, Mo.App., 280 S.W.2d 425; Fordyce v. Fordyce, Mo. App., 242 S.W.2d 307; Rone v. Rone, Mo. App., 20 S.W.2d 545.
[12] Hurley v. Hurley, Mo.App., 284 S.W.2d 72; Hensley v. Lake, Mo.App., 274 S. W.2d 493; Parks v. Cook, Mo.App., 180 S.W.2d 64.
[13] Cherry v. Cherry, Mo.App., 272 S.W. 2d 700; Lehr v. Lehr, Mo.App., 264 S.W. 2d 35; Montgomery v. Montgomery, Mo. App., 257 S.W.2d 189.
[14] Wells v. Wells, Mo.App., 117 S.W.2d 700, 704; Tuter v. Tuter, Mo.App., 120 S.W.2d 203, 205; Davis v. Davis, Mo. App., 254 S.W.2d 270.
[15] Lehr v. Lehr, Mo.App., 264 S.W.2d 37; Patterson v. Patterson, Mo.App., 215 S.W.2d 761; Shepard v. Shepard, Mo. App., 194 S.W.2d 329.