394 S.W.2d 437 (1965)
P____ D____, Plaintiff-Respondent,
v.
C____ S____, Defendant-Appellant.
No. 8404.
Springfield Court of Appeals, Missouri.
September 11, 1965.
*439 Keith V. Williams, Springfield, for defendant-appellant.
Douglas & Douglas, Neosho, for plaintiff-respondent.
STONE, Judge.
This appeal brings in review another in the endless caravan of broken homes and separated families moving across the judicial scene. We cloak the actors with anonymity that the innocent child, whose custody is in issue, may not be humiliated further in years to come by a recorded recital of parental conduct. On May 10, 1961, the circuit court entered a decree in a divorce suit brought by the mother finding that she was of "good moral character" and was the innocent and injured party, granting her a divorce, awarding to the father major custody of the child, a son then nine years of age, and to the mother minor custody during the months of June, July and August each year, and ordering the father to pay $12 per week to the mother while the son was in her custody. The pleadings in the divorce suit are not before us, and we are not informed as to the ground on which the mother sought and was granted a decree or as to what considerations motivated the custodial provisions. We learn from the record in this custody proceeding that the parents also had two daughters, both of whom were married and accordingly were not mentioned in the decree. One of these daughters (to whom we hereinafter refer as daughter P), then twenty-two years of age, resided with her husband and child in the county seat town in Southern Missouri where the parents had lived. The other daughter (to whom we refer as daughter B), then twenty years of age, resided with her husband in a metropolitan area in California. The father was forty-three years of age at the time of the divorce. The mother's age is not disclosed.
The present proceeding was instituted by the filing of the father's motion to modify on June 20, 1964, in which he prayed that the mother's minor custody during June, July and August each year be terminated and that he be awarded full care and custody of the son. On June 24, 1964, the mother answered the father's motion and filed a counter-motion to modify in which she prayed that the father's major custody be terminated and that she be awarded full care and custody of the son. At the conclusion of the trial on August 7, 1964, the court denied the father's motion to modify, found that "conditions have changed as alleged in [the mother's] counter-motion to modify," awarded major custody to the mother for eleven months during each year and minor custody to the father for the month of July each year with the father to pay the son's travel expenses between the mother's home and the father's home, granted permission to the mother to take the son out of the state, ordered that other provisions of the original decree remain in force, and taxed the costs against the father. He appeals.
It is a trite principle that a custodial order once made becomes as conclusive as any other order [Schumm v. Schumm, Mo. App., 223 S.W.2d 122, 126; Brake v. Brake, Mo.App., 244 S.W.2d 786, 801; Lehr v. Lehr, Mo.App., 264 S.W.2d 35, 37] and may be disturbed only upon proof of changed conditions subsequent to entry of the order coupled with a showing that modification of the order would promote the best interests of the child or children involved. Hirsch v. Hirsch, Mo.App., 366 S.W.2d 484, 489(3-5); Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 73(1-3); Frame v. Black, Mo. App., 259 S.W.2d 104, 108(4).
As is so frequently true, the charges in the respective motions outdistanced the proof, the father's charges more egregiously (so we think) than the mother's. And, since our decision must be predicated on the evidence adduced rather than on the accusations pleaded, we pass the formal motions without comment concerning their content and proceed to a review of the pertinent and material facts.
*440 After entry of the decree of divorce on May 10, 1961, the mother with the father's permission (so she said) took the son with her to the home of daughter B in California. Shortly after July 4, 1961, the father made a trip to California for the purpose of returning the son to Missouri, pursuant to the mother's request (so the father testified) "because she couldn't do nothing with him [the son]." The father's description of the "kind of deal" he found was that "I had to get his [the son's] hair cut, it was growed down to his shirt, and he had his shoes kicked off his feet and he didn't look good at all." The mother testified, without denial by the father, that he did not pay the child support of $12 per week, as required by the original decree, while the son was in her custody.
After the father and the son returned to Missouri in July 1961, both resided in the home of daughter P and she cared for the son until about June 15, 1962, when the father announced that "he was getting married and . . . was moving" to a smaller Missouri town some fifteen miles distant. During the remainder of the Summer of 1962, the son was in the care and custody of the father's fiance. During July 1962 (so the fiance testified) or during August 1962 (so the father said), the father moved to a larger Missouri city some ninety miles distant; and during "the last of August" 1962 his fiance and his son moved to the same city where, on September 18, 1962, the father and his fiance (hereinafter referred to as the stepmother) were married and thereafter continued to reside to the time of hearing, to wit, August 7, 1964. The stepmother's age is not disclosed, but she had two sons by a prior marriage, one of whom was (at the time of hearing) fifteen years of age and lived in the home with her, the father and his son, and the other of whom was twenty years of age, married, and not a member of the same household.
The mother did not see the son between July 1961, when the father returned him from California to Missouri, and June 1963, when the mother came to the home of daughter P in Missouri and, for a period of some seven weeks thereafter, had custody of the son in that home. During the Summer of 1962, the mother "didn't feel too good" and "was sick." Being unable to come to Missouri, the mother anticipated that daughter P "was going to visit us [in California] that summer for sure" and would bring the son with her, but "something went wrong" and daughter P did not make the trip. The mother asserted, and the father denied, that through daughter P, as an intermediary, the mother unsuccessfully had endeavored to arrange for the father to send the son to California by airline. In any event, the mother had no custody of the son in the Summer of 1962.
At this point, we take notice of the evidence pertaining to several incidents during the winter following the marriage of the father and the stepmother on September 18, 1962. The first of these was the stepmother's refusal and return of a Christmas package mailed by the mother to the son. The father's testimony concerning this was: "Q. Were you at home when a package addressed to [the son] was refused? A. There wasn't no package at the house to be refused. Q. You are sure of that? A. Positive." The stepmother quickly conceded that she had received "a notice . . that there was a package" from the mother addressed to the son and that she had refused that package. Her "reasons" for refusal were: "Well, his [the son's] mother had never contacted him in no way since I had took the child, and I really felt like she had been unfair to him, and it did irritate me and I returned it, and I wrote her a note, and I am very sorry; I am very sorry for that."
The "note," to which the stepmother alluded, was dated January 8, 1963, and (omitting the date and the one-word salutation, to wit, the mother's given name) read as follows: "Just a line to let you know we did not claim the package you sent so it will be returned to you. Since you walked out on [the son] and denied yourself a mother's rightswe just ask one favor of *441 you and that is(To Leave us alone). We don't need any charity from you so all your packages and letters to here will be unclaimed." The father admitted that he had read the "note" before the stepmother had mailed it.
We pause to agree with the father's counsel that prior transgressions of the moral law do not necessarily require that a parent be denied or deprived of custody of a minor child [Johns v. McNabb, Mo., 247 S.W.2d 640, 643], but we hasten to observe that we perceive no strong and impelling evidence of repentance and that the trial judge was in a far better position than we are to make a judgment as to whether the stepmother's protestation that she was "sorry" (not accompanied by any acknowledgement of wrongdoing or indication of penitence on the part of the father) was a manifestation of soul-centered sincere repentance or simply a skin-deep superficial offering motivated by the exigencies of litigation.
Daughter P testified that, when the father came to her home during the Christmas season of 1962, "I told him since I hadn't seen [the son] to give him his gift, that there it was, and I started to hand it to him and he gave it back to me and said that [the son] could not have the gift, that [the stepmother] would not accept it and he wouldn't accept it."
When their grandfather died in February 1963, both daughter B (from California) and daughter P saw their father at the grandparents' home in the county seat town where the parents had lived prior to their divorce and where daughter P still lived. Learning from the father that he and the son were staying temporarily at the nearby town where the stepmother had lived prior to her marriage, daughter B and daughter P drove there to see their younger brother. They found him in a trailer where the stepmother's older son and his wife lived. As daughter B related it, when her brother saw her "he started crying and threw his arms around my neck." The stepmother's younger son also was present on that occasion; and, when asked to describe "the way the two boys were dressed," daughter B said that "[the stepmother's younger son] was dressed very nicely, he had on new clothes, had a good grooming, his hair had been cut and everything, and [her brother] had some very ragged jeans that had been patched several times and a sweat shirt that was absolutely filthy, and his hair was hanging down over his ears." The father permitted the son to spend one night with the daughters.
On cross-examination, daughter B readily conceded that "I told him [the father] that considering the way that he was treating my brother and my sister, that I felt it hard to consider him as a father to me either." In subsequent answers, daughter B said that "he stood back and watched his wife [the stepmother] try to hide in the trailer and refuse to let me see my little brother, and he didn't want me to talk to him"; that "he threatened my mother, and his wife [the stepmother] threatened my sister"; and that "lots of times" while drinking he had threatened that "he might kill some members of the family."
Daughter P had not attempted to visit her brother [the son] in the home of the father and the stepmother because the stepmother had told her "to stay away, that I couldn't see him if I came up there." Although agreeing that she had never seen the stepmother "hit" the son, this daughter also stated that "I have never seen her love himI mean kind words or anything." Daughter P liked the stepmother "at first" but frankly admitted that the stepmother had not been in her home for some two years and was not welcome there at the time of hearing.
Witness Mary S_____, called by the mother's counsel, testified that in 1963 she had had several conversations with the stepmother, in one of which the stepmother had commented "that she had found out that she could draw social security on [the son] if anything happened to [the father]" and *442 also had told the witness about returning the mother's Christmas package to the son.
As we have noted, the mother returned to Missouri in June 1963 and, for a period of about seven weeks, had custody of the son in the home of daughter P. She returned again in 1964 and, after having notified the father over long distance that she would come for the son the following day, the mother accompanied by her brother and sister on June 3, 1964, drove to the home of the father and the stepmother in the larger Missouri city. When the father and the son came outside, the mother told the son that she had come for him. His reply was, in substance, that he did not want to go with her. A single witness, the stepmother, supplemented the narrative of this incident by stating that the son twice asked the mother, "why did you run off and leave me?" The mother sought the father's assistanceas he put it, the mother asked him to "make [the son] go." But the father's reply, repeated several times in similar language, was that "if he wants to, its perfectly all right; I can't keep him from it, but I am not going to make him go." Finally, so the mother's brother testified, the father "went to stomping his feet and he said he would stomp hell out of anybody that tried to take the boy, and that's when I got out of the car." In further conversation with the father for some thirty minutes, the mother's brother unsuccessfully sought to persuade the father "to get the boy ready, let him come on home." During this incident, the son was crying and (in the language of the mother's brother) "was scared to death and he would look at his dad every time he said anything." The father's attitude is exemplified by this question and answer on cross-examination, immediately following his testimony that he had known, at the time of the incident under discussion, that the original decree awarded custody of the son to the mother for three months: "Q. But you made no effort to have [the son] comply with this court order, did you? A. I didn't have nothing to do with it." The incident of June 3, 1964, was terminated by the mother's departure without the son.
Within a few days, the mother instituted a proceeding in habeas corpus to obtain custody of the son; and, when the father consulted counsel after service of the writ, arrangements were made for custody of the son to be transferred to the mother in the office of the father's counsel on June 17, 1964. During the period of about thirty minutes in counsel's waiting room on that date, the son (then in the company of the father and the stepmother) "sat with his eyes on the floor," and he and the mother had no conversation with each other. After counsel had, in his office, told the mother that "she wasn't supposed to take [the son] out of the state . . . and important things like that," the mother prepared to leave. The father's version was that the son started to cry, said "I don't want to go," and implored the father and his counsel "don't let her [the mother] take me," but that the mother, with the son still crying, "got him by the arm and drug him out the door with him holding the door facing, trying to hold back." The account of witness Fern J_____, who had accompanied the mother on this mission, was that, after the son had told the father and the stepmother goodbye, he said that "he didn't want to go"; that he did "not really cry, he fretted some"; that the son went out the door "in front of her [the mother]" and the witness followed with the son's suitcase; that, "by the time we got to the street he [the son] was laughing and conversed with us"; and that, on the drive to the home of daughter P, the son seemed to relax, "was happy and laughing," and displayed much affection for the mother.
The mother and the son lived in the home of daughter P from June 17 to August 7, 1964, the date of hearing. When asked to tell the trial judge how the son "is getting along," daughter P said that "he is perfectly happy, he laughs and he plays . . . he never said anything about wanting to go back" to the city where the father resides.
*443 The father's home, where the son had lived for about two years prior to the date of hearing, was a three-bedroom house which the mother's counsel conceded to be "adequate." The son attends a public school across the street, twice identified erroneously by the father as "Cameron" school. The father gave a simple affirmative answer when asked by his counsel whether the son went "to Sunday school and church," but the further query as to "what church" elicited only the laconic, undeveloped reply "Baptist." When taken with his testimony as a whole, these unconfirmed statements by the father concerning the son's religious training lack the "naturally compelling ring of sincerity" [Clemens v. Clemens, Mo., 235 S.W.2d 342, 346] and leave us unconvinced. Cf. Graves v. Wooden, Mo.App., 291 S.W.2d 665, 668. The father, the stepmother, and witness Eloise H_____, a neighbor, averred that the son and the father's stepson "get along fine." Both the father and the stepmother solemnly asserted that they had done nothing to alienate the son from the mother, and witness Eloise H_____ said that she had not heard either the father or the stepmother "say one word against the boy's mother."
In the latter part of 1961, the mother remarried one E_____ D_____ (hereinafter called the stepfather) in California. For several months after their marriage, they resided next door to daughter B. Thereafter, they lived in a four-room "duplex house" or "apartment" and perhaps for a time at another address. After the mother had returned to Missouri in the Summer of 1964 and shortly prior to the hearing, the stepfather leased a house, because (as the mother put it) "he knew it was important to get a place for [the son]." Since this house was one of two residences owned by her sister, the mother was familiar with it and (so she said) the father also had seen it. Although there was no testimony detailing the facilities afforded by this house, a picture of it made by a commercial photographer and received in evidence indicates that it is a one-story dwelling with surrounding yard which should be adequate for a family group of three, namely, the mother, the stepfather and the son.
The father's counsel comments that the stepfather "was conspicuous by his absence" at the hearing and suggests that this is an important factor, citing Graves v. Wooden, supra, 291 S.W.2d at 669. In that case, the stepfather resided in a county adjoining that in which the hearing was held [291 S.W.2d at 668] but did not testify. 291 S.W.2d at 667. In those circumstances, we thought that "the utter absence of any indication as to [the stepfather's] disposition or feeling toward [the child] may be significant." 291 S.W.2d at 669-670.
In the case at bar, the mother and the stepfather, obviously of limited financial means, reside in California. As the mother explained without objection, the stepfather was employed (apparently in a floral shop) at the time of hearing and "it is costing so much with all this, that he wanted to be present but couldn't." Daughter B, a resident of the same metropolitan area in California, who manifestly was devoted to "my little brother" (the son), appeared in person at the hearing and testified, without objection, that she had visited frequently in the home of the mother and the stepfather; that the stepfather knew the son; and that "he [the stepfather] told me how he would like to have him [the son] live with them, how much he loved children." Of course, the quoted statements in the last two preceding sentences might have been excluded on timely and proper objections; but, having been received without complaint, the probative worth and effect of this testimony were for the trial judge, as trier of the facts. Fellows v. Farmer, Mo.App., 379 S.W.2d 842, 846(2), and cases cited in footnote 3; Turner v. Yellow Cab Co. of Springfield, Mo.App., 361 S.W.2d 149, 154-155(1); Edmisten v. Dousette, Mo.App., 334 S.W.2d 746, 753, and cases cited in footnote 13. The trial court also had for consideration the following testimony of the mother, likewise *444 received without objection: "Q. . . . [I]f this court saw fit to award this child to you on the full-time basis, could you care for him? A. I certainly could. Q. And would your husband [the stepfather] be willing to care for him? A. Yes."
Pointing to certain inconsistencies (principally as to home addresses) between the mother's testimony in a deposition and at the hearing which he characterizes as "verging on perjury," the father's counsel urges that the mother thereby is shown "to be unfit to have the custody of the son." As counsel reminds us, we have said (as have other courts) that perjury demonstrates moral unfitness to have the care and custody of minor children. L_____ v. N_____, Mo.App., 326 S.W.2d 751, 756(9); E_____ v. G_____, Mo.App., 317 S.W.2d 462, 467; S_____ v. G_____, Mo.App., 298 S.W.2d 67, 77(14). See Shepard v. Shepard, Mo.App., 194 S.W.2d 319, 328. We are still of the same mind. But the revolting brand of perjury is not to be applied with indifference or unconcern; and painstaking analysis of the mother's testimony, together with that of daughter B who also was subjected to searching cross-examination in some of the same factual areas, leaves us wholly unpersuaded that the mother has defiled herself with perjury, i. e., with "`wilful false swearing to a substantially definite material fact.'" State v. Swisher, 364 Mo. 157, 163, 260 S.W.2d 6, 11 (7). Upon trial, the mother frankly acknowledged that, as to certain answers in her deposition, "I was confused; the address and house numbers out there are longer than they are here; it is hard to remember every house number and every place right off." But neither inconsistency nor confusion is synonymous with perjury; and this is particularly true where, as here, the inconsistency and confusion are dissipated by explanation and clarification in the testimony of the mother and daughter B. The father's charge that the mother is morally unfit by reason of testimony "verging on perjury" cannot be honored.
The father also assigns error on account of the trial court's rejection of the suggestion of the father's counsel at the conclusion of the hearing that the court "confer with the boy outside the presence of any of the parties or their counsel." The answering comment was that "the court doesn't believe it would be helpful to talk to the boy in this case," to which counsel made no objection and took no exception at the time. The cases cited by counsel to this point do not demonstrate error in the instant case. In M_____ v. G_____, Mo.App., 301 S.W.2d 865, where the principal factual issue was as to whether a daughter, twelve years of age, had been mistreated by her mother and stepfather, the trial court erred in refusing to permit the daughter to testify when called as a witness by the father. 301 S.W.2d at 868-869(3-5). The other cited cases [Graves v. Wooden, supra, 291 S.W.2d at 669(4); Fordyce v. Fordyce, Mo.App., 242 S.W.2d 307, 313(2)] announce the indubitably sound principle that, although entitled to consideration, a child's wishes are not to be indulged if they are inconsistent with attainment of the paramount objective, namely, the furtherance of the child's welfare.
No doubt the trial judge in the case at bar understood that the suggestion of the father's counsel was motivated by a calm confidence that the son would express a preference for custody by the father. However, in rejecting the suggestion, the trial judge acted with the advantage of having observed the conduct and demeanor of the parties and their witnesses who had passed in review before him, and with the benefit of the evidence fresh in his recollection, including the hereinbefore-noted testimony that, when the mother had sought unsuccessfully on June 3, 1964 (only about two months prior to the hearing), to exercise her right to summer custody, the son "was scared to death and . . . would look at his dad every time he said anything," and the mother's further statement that the son's conduct on that occasion "was a shock to me . . . he didn't do that last year, he was fine." We would not be misunderstood as condemning the frequently-indulged *445 practice of trial judges to confer privately with children involved in custody cases. However, no case has been brought to our attention in which a trial judge has been convicted of reversible error in rejecting a suggestion that he so confer, and we are of the opinion that the advisability of so conferring is a matter which properly should rest in the sound judicial discretion of the trial court. In the particular circumstances of the record presented, we cannot say that the trial judge was guilty of an abuse of judicial discretion in rejecting the suggestion of the father's counsel.
In another point, the father avers that there was "no substantial evidence to overcome the presumption that the son needs his father and that custody was properly awarded . . . in the original divorce decree." But the guidance and supervision of an understanding father, profoundly beneficial as they would be for the son, now thirteen years of age [Davis v. Davis, Mo.App., 354 S.W.2d 526, 531; Fordyce v. Fordyce, supra, 242 S.W.2d at 314; Green v. Perr, Mo.App., 238 S.W.2d 924, 927], could never constitute an adequate and complete substitute for all that is implicit in, and flows from, the love and devotion of a dedicated mother. Thus it is that our cases uniformly recognize that, where neither parent is unfit, the best interests of a minor child will be served by an arrangement which will enable his association with both parents [Davis v. Davis, supra, 354 S. W.2d at 531(6); Lewis v. Lewis, Mo.App., 301 S.W.2d 861, 863(5); Fago v. Fago, Mo. App., 250 S.W.2d 837, 842; Lambert v. Lambert, Mo.App., 222 S.W.2d 544, 548(6); Baer v. Baer, Mo.App., 51 S.W.2d 873, 879 (11)], and that our courts so severely condemn any conduct on the part of one parent which is calculated to, or has the effect of, instilling in the child fear, disrespect or hatred for the other parent that it frequently is said that such conduct may be sufficient to justify and require a change of custody [Chilcutt v. Baker, Mo.App., 384 S.W.2d 854, 860-861; S_____ v. G_____, supra, 298 S. W.2d at 76-77(13); Luethans v. Luethans, Mo.App., 243 S.W.2d 801, 803; Rone v. Rone, Mo.App., 20 S.W.2d 545, 549; Kaplun v. Kaplun, Mo.App., 227 S.W. 894(2)], regardless of whether or not the condemned result is intended by the offending parent. Fago v. Fago, supra, 250 S.W.2d at 841-842; R_____ v. E_____, Mo.App., 364 S.W.2d 821, 828.
In the case at bar, the original decree declared that the mother was of "good moral character" and was the innocent and injured party, and there was no showing that she was in any respect unfit to associate with and have the custody of her son. Regardless of whether or not the father so purposed (a subject upon which the record leaves us with a definite opinion perhaps better left unrecorded), his conduct and that of the stepmother in the same home have pointed toward a complete estrangement between the son and his mother and an irreparable rupture of the parental-filial tie a grossly unnatural and unjustifiable result not warranted by anything here disclosed and not tolerable at a bar of justice.
Furthermore, the father's attitude and conduct with respect to the custodial provisions of the original decree, which would have deprived the mother of the son's custody during the Summer of 1964 but for her resort to the extraordinary writ of habeas corpus, evidenced a lack of respect for constituted authority, not mitigated or excused by the fact that he subsequently recognized the decree upon the insistence of his counsel. Wise and discerning jurists have pointed out that interference with or deprivation of decretal rights of visitation or custody is a factor properly to be considered in determining the welfare of a child [S_____ v. G_____, supra, 298 S.W. 2d at 76(11); Green v. Perr, supra, 238 S. W.2d at 928(4); Williams v. Williams, Mo. App., 211 S.W.2d 740, 742(5)], "not for the purpose of punishing [the disrespectful or disobedient parent]but rather for the purpose of measuring her [or his] mental attitude toward law and order," for "[a] person with such little regard for constituted authority can hardly lay claim to being an *446 ideal person to direct the training and upbringing of a young child." Shepard v. Shepard, supra, 194 S.W.2d at 327; Foster v. Foster, Mo.App., 300 S.W.2d 857, 869. And other equally wise and discerning jurists have written that such interference with or deprivation of decretal rights constitutes a changed condition which may justify and require a modification. Rutstein v. Rutstein, Mo.App., 324 S.W.2d 760, 763(4); Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 780(11); Green v. Perr, supra, 238 S.W.2d at 927(2); Olson v. Olson, Mo.App., 184 S.W.2d 768, 773(13). See Patterson v. Patterson, Mo.App., 375 S.W.2d 614, 621-622(6).
We agree with the father's counsel that custody of a child never should be awarded or changed with any thought of meting out punishment upon either parent [McKenzie v. McKenzie, Mo.App., 306 S.W. 2d 588, 591(4); Graves v. Wooden, supra, 291 S.W.2d at 669(3); Schumm v. Schumm, supra, 223 S.W.2d at 125(4)], but we cannot concur in his statement that "the inescapable conclusion" is that the trial court's decree of modification was "intended to punish" the father. On the contrary, we are satisfied that the capable and conscientious trial judge had in mind, as we certainly do, that the only rigid, inflexible and unyielding principle in custody cases is that the welfare of the child is paramount and supreme [L_____ v. N_____, supra, 326 S.W.2d at 755 (7); I_____ v. B_____, Mo.App., 305 S.W.2d 713, 719(7)] and that pressing problems of custody must be resolved not by applying academic rules or by mouthing pious platitudes but rather by determining, insofar as is humanly possible, what will best serve and promote the child's welfare. C_____ v. B_____, Mo.App., 358 S.W.2d 454, 459.
In discharging the unwelcome and unpleasant task thrust upon us in this case, we have been acutely conscious of the finite limitations imposed by human frailty and fallibility upon courts, counsel and parties alike, and we have been inexpressibly burdened with the grave responsibility attendant upon discharge of our duty bearing upon the sacred relationship between parent and child and involving the future course of an innocent boy. Cognizant that no judicial decree could be entered which would not engender sorrow or bitterness in some interested party [Abel v. Ingram, 223 Mo.App. 1087, 24 S.W.2d 1048, 1049] and that no earthly power could recapture for this unfortunate boy the blessings of which he has been deprived by the tragic failure of his parents' marriage [Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, 460; Ballew v. Ballew, Mo.App., 288 S.W.2d 24, 26], it may not be amiss to remind the parties, scant comfort though it affords to us, "that we are in no way responsible for the causes which have unhappily brought about the situation with which we are confronted." In re Krauthoff, 191 Mo.App. 149, 152, 177 S.W. 1112, 1113.
In this category of cases, the court frequently is confronted with the necessity of making an exceedingly difficult choice as to which may be the lesser of two evils in respect to the child's future [E_____ v. G_____, supra, 317 S.W.2d at 468], and the evidence ofttimes does not enable the court to say with certainty that the best interests of the child will be served by any given disposition. C_____ v. B_____, supra, 358 S. W.2d at 459-460. Although we are in no doubt but that the evidence abundantly justified changing the major custody from the father to the mother, we readily agree that additional details concerning the environment and surroundings in California, into which the son is to be taken, would be desirable. However, we are not impressed by the complaints in the father's brief concerning the lack of detail in certain evidentiary areas, e. g., as to the school facilities in California, the son's "athletic program" there, and whether he "would have the companionship of other children." For we apprehend that adequate public school facilities are available in the metropolitan area where the son will reside with his mother and stepfather; that boys engage in baseball, basketball, *447 football, tennis, swimming, and other sports in California as they do in Missouri; and that, even though the son may be deprived of "the companionship" of the stepbrother, now sixteen years of age, he will have in California not only the companionship of schoolmates and neighborhood playmates of his own age but also the precious opportunity (presently denied to him) freely to associate with one of his older sisters, daughter B, to experience the warmth of her companionship and to know the depth of her love for him. So we think that justice should not be denied and that the right of the matter should be no longer delayed, if there was sufficient evidence in the record, as we have concluded that there was, on which the perspicacious trial judge reasonably might have reached an informed conclusion as to what would further the best interests of the son.
The cases are legion in which it has been declared that, although not binding upon the appellate court, the findings of the trial court as to custody of a minor child are not to be lightly regarded or easily disturbed, but that the appellate court should defer to such findings unless it is firmly convinced that the child's welfare requires some other disposition. Yount v. Yount, Mo.App., 366 S.W.2d 744, 748(4); Davis v. Davis, supra, 354 S.W.2d at 532 (7); Tootle v. Tootle, Mo.App., 329 S.W. 2d 218, 224(9); Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147(3); I_____ v. B_____, supra, 305 S.W.2d at 720(8). That principle becomes applicable in the instant case, where the trial judge had an opportunity to see and appraise the parties and their witnesses, and where a meticulous search and agonizing consideration of the transcript leave us unable to say that the son's welfare would be best served by some disposition other than that decreed nisi. Of course, the circuit court retains continuing jurisdiction, notwithstanding the award of major custody to the mother, to modify the custodial provisions of the decree [Davis v. Davis, supra, 354 S.W.2d at 532, and cases there cited] upon sufficiently compelling proof of changed conditions prior to the son's majority or the death of one parent, whichever first occurs. Hayes v. Hayes, 363 Mo. 583, 589, 252 S.W.2d 323, 327(5); In re Wakefield, Mo.App., 274 S.W.2d 345, 347(5); Schumm v. Schumm, supra, 223 S.W.2d at 125(1).
The judgment is, in all respects, affirmed.
RUARK, P. J., and HOGAN, J., concur.