D_____ M_____ T_____,
Respondent,

v.

D_____ V_____ T_____,
Appellant.

No. 25787.

Missouri Court of Appeals,
Kansas City District.

July 6, 1972.

Carl F. Sapp, Columbia, for appellant; Sapp, Woods, Dannov & Orr, Columbia, of counsel.

Raymond C. Lewis, Jr., and David B. Rogers, Columbia, for respondent.

PRITCHARD, Judge.

This is an appeal from a judgment awarding custody of two minor sons of the parties, who were not divorced, to respondent wife. The issue is whether under all the facts, and considering what would be in the best interest of the children, the wife is a fit and suitable person to have the custody of the sons, who were ages six and eight.

While appellant husband's brief does not comply with Rule 83.05 in its fact statement and in points made, yet from a consideration of the entire brief the issue above becomes clear. In view of the soon to be increased jurisdictional case load of this court, counsel are cautioned that the drastic action of dismissal of appeals may in the future be more rigidly applied. This for the reason that there will be less time

to explore briefs and ascertain just what parties on appeal contend for reversal or affirmance. Counsel should further appreciate the aid rendered to the court by good briefing, in compliance with the rules, thus expediting the disposition of cases. With these cautions, respondent's suggestion that the appeal be dismissed is declined.

The parties separated in 1968, respondent taking the two sons and moving to Columbia, Missouri, from Hallsville, Missouri, the marriage home. She thereafter filed suit for divorce, but the decree was denied her quite apparently for the reason of her adulterous relation to one D——— B———. On this hearing respondent admitted that her testimony in the divorce trial that she had not had sexual relations with D——— B——— and did not live with him was false. D——— B——— was a married man with whom respondent was in love and with whom she continued to have sexual relations. Upon respondent's moving to Columbia, D——— B——— helped her to find an apartment, in purchasing furniture, and bought her a television set. He occasionally took the sons to school, and spent much time at respondent's apartment where she had two bedrooms, one for the sons. Respondent admitted that D——— B——— was served with a subpoena for the divorce trial at 4:00 in the morning at her home and while he was in his skivvies. While the divorce was pending, D——— B——— was married, and the sexual relations occurred then and while the sons were living with respondent, which they had done for about ten months. During that time respondent had not encountered any serious problems with either of the sons.

After the divorce trial, in which no custody order was made, appellant came to respondent's home and took the sons with him, according to respondent, forcibly. He denied using force, but conceded that he considered the taking non-forceful because of the element of speed. Appellant took the sons to Hallsville and changed them to the school there. Respondent was unable to see the sons for four or five months, except for Christmas Day in 1968. Her attempts to see them were refused, and appellant threatened her with chained German police dogs if she came near the house. Through the intervention of a minister, respondent saw the children at the house of appellant's father in April, 1969, who along with a brother had instructions for appellant not to let respondent have the sons. In the presence of the sons, appellant cursed respondent and used obscene language against her, as well as giving her direct physical abuse.

There was a large amount of evidence concerning the care and treatment of the sons while they were with appellant. They were left with a variety of babysitters while appellant worked as a part-time deputy sheriff. The condition of the Hallsville home during that time is significant. It was described by Rev. Burgin as deplorable, with clothes strewn about, animal feces and trash, weapons, chemicals left about, dirty dishes, and the children's underpants lying around with dried feces on them. Photographs of the inside of the home, taken on four occasions, graphically portray the disarray and filth in the home. Two teachers of the sons testified that they came to school in ragged clothes, torn zippers, worn-out shoes, without coats in cold weather, "grimy"—"not surface dirt on them," and one had bowel movements in his pants. One of the boys had a small speech impediment, and lost his report cards. The other was not careful of his possessions and did not respond too well to authority, lacking normal childhood emotions for his age. He was the dirtiest boy in his class. There was an abrupt change for the better in the appearance of the boys prior to trial.

Appellant admitted that one of the boys had dental cavities and was in need of dental treatment, but appellant let the cavities go for about six months without making arrangements to have them treated. During the time appellant had the children after the divorce trial, he dated frequently,

with some dates taking place in the home with the children. One date actually baby-sat for him. Although appellant testified that he took the boys to church some, he could not remember the name of the minister or the Sunday School teacher. There was testimony from respondent that appellant kept his guns and ammunition in reach of the boys, this being denied by him, and respondent also testified that on one occasion when she was visiting the boys, and scolded one for picking up a gun, she was threatened by appellant with being hit in the mouth. A monkey kept by appellant in the house bit one of the boys twice, and the animal discharged elimination in the house and car.

In contrast to the care and treatment the children were accorded by appellant with that which respondent rendered them during the ten months she had them after the divorce trial, the evidence is: The children were kept clean, well-fed, appropriately dressed, well-disciplined, and were apparently happy. Respondent took them to a doctor when they were ill. She took them to Sunday School and to church, where she taught a class. The boys were completely toilet trained during that time. They were taken by her on walks, roller skating, shopping, and to parades and picnics. For the ten month period respondent supported the children without any help from appellant. She earned a net of $390.00 per month as a histology technician at the University of Missouri Medical Center, a responsible position. She then used a baby sitter who regularly sat for members of the medical staff, and she testified that if she had the children she thought she could arrange her work hours to match the school hours, but if not, the baby sitter would be available after school to 5:00 p. m. She might have been able to manage financially without help, but to make ends meet she would need about $101.00 more per month. Appellant's salary, at the time of separation, was about $500.00 per month.

 The thrust of appellant's argument is that respondent "who admittedly lives in an adulterous relationship with a married man in the same house with her minor children and who admittedly committed perjury should not be awarded custody of minor male children and such custody is not in the best interests and welfare of such children." While it is true, as appellant says, that the morals of the respective parents are an appropriate subject of consideration in child custody cases, M——— L——— v. M——— R———, Mo.App., 407 S.W.2d 600, 602[1], that consideration is by no means exclusive. The guiding star is of course the best interests and the welfare of the children. Hugeback v. Hugeback, Mo.App., 444 S.W.2d 23, 27[5–7]; Zimmerman v. Zimmerman, Mo.App., 422 S.W. 2d 386, 388[2–5]. Certainly, respondent's conduct in living in admitted adultery is a reflection upon her personal morals and is not in accordance with established and prevailing mores of society. But, see Paxton v. Paxton, Mo.App., 319 S.W.2d 280, where the evidence strongly showed adulterous acts of the wife, yet this court found it to be to the best interests of the four children that their custody be awarded to the mother. See also Stone v. Stone, Mo.App., 378 S.W. 2d 824, 840; and Pippas v. Pippas, Mo.App., 330 S.W.2d 132, 139. Her admitted perjury in the divorce trial was not indicative of the best of morals. Cf. S——— v. G———, Mo.App., 298 S.W.2d 67, 77[14]; and P——— D——— v. C——— S———, Mo. App., 394 S.W.2d 437, 444[5, 6], which says that perjury may demonstrate moral unfitness. In this case, there is no evidence that any acts of adultery were committed in the presence of or with the knowledge of the two sons. On the whole of the evidence it is apparent that respondent's admitted immoral conduct had no deleterious effect upon her ability to care for the two children or their welfare. The evidence is clear that respondent did in fact care for the children in an exemplary manner. On the contrary, the evidence shows that the conditions of neglect permitted by appellant were not conducive to the best welfare of the two boys while he had them in his custody. Of further important considera-

tion is appellant's abuse of respondent committed in the presence of the two sons. The entire testimony was heard and considered by a very able and experienced trial judge to whom this court will defer on the matters of conflicts in the evidence. The record is not convincing that the best interests of these children require a different disposition of custody than that awarded. J. v. R., Mo.App., 446 S.W.2d 425, 429[8]. Hopefully, the parties will amicably conform to the trial court's judgment and proceed, although apparently irreconcilably separated, to rear the children in a manner which will enhance their chances of having emotional stability and concomitant social success when they reach adulthood.

The judgment is affirmed.

All concur.